# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3743
_____

Lucinda Dalton

*Plaintiff - Appellant*

v.

ManorCare of West Des Moines IA, LLC, et al.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: December 9, 2014
Filed: April 7, 2015

_____

Before LOKEN, BYE, and SMITH, Circuit Judges.

_____

LOKEN, Circuit Judge.

Nurse Lucinda Dalton was terminated from her supervisory position as Director of Care Delivery (DCD) at the ManorCare of West Des Moines skilled nursing facility. Dalton brought this action against ManorCare, various ManorCare affiliates, and three ManorCare managers (collectively, ManorCare), alleging they interfered with her statutory rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 *et seq*., and discriminated against her because of her Chronic Kidney Disease

disability in violation of the Iowa Civil Rights Act, Iowa Code Ch. 216, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* Defendants removed the suit to federal court. After extensive discovery, the district court[1] granted defendants summary judgment, dismissing all claims. Dalton appeals the dismissal of her FMLA claims, arguing that Manor Care wrongfully interfered with her FMLA rights by terminating her during an FMLA-protected absence. Reviewing the district court's decision *de novo*, we affirm. See Phillips v. Mathews, 547 F.3d 905, 909 (8th Cir. 2008) (standard of review).

## I.

Dalton served as a ManorCare nurse from May to July of 2009. Rehired in March 2010, she was promoted to DCD in September. That summer and fall, Dalton began experiencing significant weight gain and edema (excess fluid that makes tissues appear doughy). Her primary health care provider, Karen Heffernan, P.A., discontinued a high blood pressure medication, suspecting Dalton's edema was a side effect. This did not resolve the problems. In late December, Dalton had gained fourteen pounds and had pitting edema; Heffernan prescribed a fluid retention medication, noting Dalton expressed concern about kidney failure but her kidney functions had been normal in October. At a December 29 appointment, Heffernan noted concern that Dalton had not lost weight and sent her to Penn Avenue Internal Medicine in early January 2011 for a chest x-ray and for testing of her kidney functions and thyroid. The examining physician noted "weight gain of 15 pounds and edema, uncertain etiology," shortness of breath, and a history of mild persistent asthma. Dalton's chest x-ray was normal. He referred Dalton to a kidney specialist, Robert Leisy, D.O., for an evaluation of her edema and excess fluids.

---

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

Dalton saw Dr. Leisy on January 25, 2011. He diagnosed Stage One Chronic Kidney Disease (CKD), "secondary to obesity," not edema,[2] and referred Dalton to Iowa Radiology for renal[3] testing. On February 4, it reported no abnormal kidney function. To treat Dalton's persistent edema, Dr. Leisy replaced the fluid retention medications prescribed by Heffernan because of a possible allergy. Dalton came to a follow-up appointment with Dr. Leisy on February 15. He noted modest improvement in her edema (a five pound weight loss) and no "renal etiology." In a deposition, Dr. Leisy testified that, on this second visit, he did not identify the cause of Dalton's edema. He described a number of possible causes and noted the possibility that no organ would ever be identified as causing the condition. He associated Dalton's Stage One CKD with obesity.

In early 2011, ManorCare nurses that Dalton supervised complained about her job performance to Dalton's supervisor, Holly Benedict. On February 21, Dalton met with Benedict and the facility's Human Resources Director, Memorea Schrader. They issued Dalton a Third/Final Written Warning for violating Major/Type B Work Rules. The Final Warning cited inappropriate negative comments about her work at the nurses' station, where patients could overhear; failure to notify staff members she had cancelled a meeting; and taking an extended lunch break and failing to attend patient care conferences. A Performance Improvement Plan accompanied the Final Warning, listing actions to correct the deficiencies and stating that Dalton and Benedict "will meet in one week to discuss progress." Dalton understood that any further performance-related issue could result in termination.

---

[2]Dr. Leisy testified that Stage One CKD is not really a disease because kidney function "is actually normal to above normal at that point." Rather, in Stage One the kidneys work harder than normal. In time, this hyperactivity can wear out the kidneys. But with proper care, such as weight loss, the Stage One patient may avoid advancing to the higher stages of CKD, which entail structural damage to the kidneys.

[3]"Of, relating to, or involving the kidneys." Webster's 3d New Int'l Dictionary, at 1921 (1993).

At the February 21 meeting, Dalton also was issued a First Written Warning reciting that she had arrived late, left early, or called in on ten different days between January 18 and February 18, 2011. For this Minor/Type C attendance issue, the employee handbook prescribed progressive disciplines that "normally require four stages" before termination. Dalton testified:

> Q. Was there any discussion in that meeting at all about the reasons for your absences?
>
> *   *   *   *   *
>
> A. There was discussions about it, about my medical condition being the reason . . . for some of my absences. And that was the time that I asked about the FMLA. I wanted to know if my job would be protected or if I could be cover[ed for] any of my absences with FMLA. And that's when Memorea told me no, I was not eligible.[4]

On Friday, February 25, Benedict spoke to Dalton about a number of unfinished tasks -- completing over-due care plans, investigating and completing a report for two patient call-light responses, conducting skin sweeps on her patients, and completing paperwork for a new patient. Dalton testified that she believed she had until the end of the month on Monday to complete skin sweeps, care plans, and admission paperwork. When Benedict checked on Dalton's progress later on Friday, Dalton had left for the day, without completing care plans and call-light responses.

---

[4]Schrader was hired by ManorCare in October 2010. She testified that she did not recall this discussion but admitted that, at the time of the meeting, she did not know that FMLA eligibility does not require twelve consecutive months of employment. The employee handbook properly advised employees, "To be eligible for FMLA, an employee must have been employed by the company for at least 12 months (does not need to be consecutive months)." Counting Dalton's previous employment, she had been employed by ManorCare for slightly more than twelve months in February 2011. Thus, Dalton was clearly FMLA-eligible.

-4-

Benedict also discovered on Dalton's desk a lab report with abnormal results that had not been passed along to the appropriate nurse.

Early on Monday, February 28, Dalton called Benedict, reporting that she was having chest pains and was going to the emergency room, where she was admitted with complaints of "atypical chest pain." Dalton was discharged at 4:30 without a definite diagnosis of the chest pain, with instructions to follow up with Dr. Leisy and Heffernan as soon as possible and a physician's note excusing her from work until Wednesday, March 2, which Dalton reported to Benedict. Benedict instructed Dalton to come to work at 1:00 on March 2, when Benedict and Schrader advised Dalton that she was suspended pending an investigation into her failure to perform job functions. Dalton testified she asked again about FMLA leave and was again told she was ineligible. On March 3, ManorCare issued Dalton a warning for failing to "observe written/oral instructions and carry out job responsibilities without errors," a Type C Work Rule violation that, combined with her prior Third/Final Written Warning, resulted in termination. This lawsuit followed.

## II.

The FMLA entitles an eligible employee to twelve weeks of unpaid leave during any twelve-month period if she has a serious health condition that makes her unable to perform the functions of her position. 29 U.S.C. § 2612(a)(1)(D). The Act makes it unlawful for an employer to "interfere with, restrain, or deny" an employee who exercises or attempts to exercise that right. 29 U.S.C. § 2615(a)(1). "An employee can prevail under an interference theory if [she] was denied substantive rights under the FMLA for a reason connected with [her] FMLA leave." Ballato v. Comcast Corp., 676 F.3d 768, 772 (8th Cir. 2012) (quotation omitted); see Lovland v. Employers Mut. Cas. Co., 674 F.3d 806, 810-12 (8th Cir. 2012).

Dalton argues that ManorCare interfered with her FMLA rights by terminating her for failing to perform job duties on February 28, when she was in the hospital being treated for a chronic serious health condition protected by the FMLA. The district court granted ManorCare summary judgment on three alternative grounds: (1) Dalton "failed to provide evidence she suffered from a serious health condition that made her unable to perform the functions of her position." (2) "Although Dalton had informed Benedict and Schrader about symptoms she was experiencing, she failed to place them on the required notice that she was going to be absent on February 28 and March 1, 2011, for a medical condition protected by the FMLA."[5] (3) "Defendants provided at least three reasons for terminating Dalton's employment, none of which had anything to do with Dalton's alleged serious health condition." We need discuss only the first and third.

**A.** FMLA defines "serious health condition" as "an illness, injury, impairment or physical or mental condition that involves" inpatient care or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). While the definition is broadly worded, the FMLA was not intended to cover all medical conditions. "With respect to an employee, the term 'serious health condition' is intended to cover conditions or illnesses that affect an employee's health to the extent that he or she must be absent from work on a recurring basis or for more than a few days for treatment or recovery." H.R. Rep. No. 103-8(I), 103d Cong., 1st Sess., 1993 WL 30779 at *40 (1993); see Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005). The Department of Labor's regulations define "continuing treatment" as involving periods of both incapacity and treatment. 29 C.F.R. § 825.115. "Incapacity" means "inability to work . . . due to the serious health condition, treatment therefore, or recovery

_____

[5]"The employer must be made aware that the absence is due to a serious illness so the employer can distinguish it from ordinary 'sick-days.'" Rask v. Fresenius Med. Care N. Am., 509 F.3d 466, 472 (8th Cir. 2007).

therefrom." § 825.113(b). "Treatment" includes "examinations to determine if a serious health condition exists and evaluations of the condition." § 825.113(c).

Dalton contends that her condition from mid-2010 until termination in March 2011 was a "chronic serious health condition" within the meaning of the regulations -- one which "(1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider . . . (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma . . . etc.)." 29 C.F.R. § 825.115(c). In the district court, Dalton argued her chronic condition was CKD. Without question, kidney disease can be a serious health condition. But Dr. Leisy testified that Stage One CKD is a warning that the kidneys are working too hard, not an advanced disease, and renal testing of Dalton revealed no abnormal kidney functions.[6] FMLA leave "includes visits to a doctor when the employee has symptoms that are eventually diagnosed as constituting a serious health condition, even if, at the time of the initial medical appointments, the illness has not yet been diagnosed nor its degree of seriousness determined." Phillips, 547 F.3d at 910. But Dalton's symptoms were not eventually diagnosed as CKD. More importantly, ManorCare did not interfere with this diagnostic process. It allowed Dalton all her medical appointments. That this time off was not considered "FMLA leave" by Dalton or by ManorCare is irrelevant.

Changing focus on appeal, Dalton argues that her unexplained edema and substantial weight gain were a "chronic serious health condition." But she did not make this fact-intensive argument to the district court. And she cites no authority -- other than her expansive interpretation of ambiguous Department of Labor regulations -- supporting the assertion that her edema and obesity were chronic

---

[6]Dr. Leisy attributed Dalton's Stage One CKD to her obesity; he believed "strongly that she did not have a primary kidney disease causing her edema."

serious health conditions entitling Dalton to FMLA leave. It is undisputed the conditions did not affect her ability to perform the functions of her position, and she did not request leave other than time needed to attend periodic medical appointments, which ManorCare consistently allowed. We do not doubt that edema and fluid retention may be signs of a potentially serious condition, such as congestive heart failure, liver disease, or primary kidney disease. But no such condition was ever diagnosed, and ManorCare did not interfere with Dalton's frequent medical appointments to obtain needed diagnosis and treatment.

Moreover, Dalton's edema and fluid retention did not result in any "incapacity" -- inability to work -- other than brief absences to obtain medical diagnosis and treatment. Dalton argues she was incapacitated on February 10 and 11, when she visited Heffernan with a myriad of complaints -- cough, severe rash, continued fluid gain, and depression. Heffernan diagnosed pruritus and acute bronchitis, prescribed medication, and told Dalton to stay off work for two days. Those were "short-term conditions" FMLA was not intended to cover. Martyszenko v. Safeway, Inc., 120 F.3d 120, 123 (8th Cir. 1997). Thus, as in Price v. Marathon Cheese Corp., 119 F.3d 330, 335 (5th Cir. 1997), Dalton's "manifestation of this condition did not rise to the level of 'serious health condition.'" See Beal v. Rubbermaid Commercial Prods. Inc., 972 F. Supp. 1216, 1224-25 (S.D. Iowa 1997) (eczema not a serious health condition); Boyce v. N.Y.C. Mission Soc., 963 F. Supp. 290, 299 (S.D.N.Y. 1997) (chest pain and shortness of breath not a serious health condition).

For these reasons, we agree with the district court that the summary judgment record establishes that, as of the February 21 job performance meeting, Dalton was not suffering from a "chronic serious health condition," and ManorCare had not interfered with her efforts to seek diagnosis and treatment for the alarming but less serious conditions she was experiencing.

**B.** That brings us to the ten days that are critical to this dispute, the meeting on February 21, when Dalton was given a Third/Final Written Warning and Performance Improvement Plan; the interaction on February 25, when Benedict concluded that Dalton went home without completing work she had been instructed to complete; the events on February 28, when Dalton went to the emergency room with complaints of severe chest pain rather than complete her end-of-month duties at work; and March 2-3, when Dalton returned from her medically-excused absence and was suspended and then terminated for work rule violations.

Dalton argues her February 28 hospital admission was a second period of incapacity attributable to a chronic serious health condition. But as we have explained, Dalton had no chronic serious health condition at that time, only recurring health issues that did not make her unable to perform her job. Moreover, Dalton failed to prove that her "atypical chest pain" on February 28 was "due to" her alleged chronic condition. The medical records prior to February 28 contain no mention of chest pain, let alone severe chest pain. There is no evidence, as 29 C.F.R. § 825.115(c) requires to establish a chronic condition, "that there were recurring episodes of severe chest pain caused by the underlying [conditions] or episodic periods of incapacity." Crowell v. Denver Health & Hosp. Auth., 572 F. App'x 650, 657 (10th Cir. 2014); accord Fink v. Ohio Health Corp., 139 F. App'x 667, 670 (6th Cir. 2005). "Where absences are not attributable to a serious health condition . . . FMLA is not implicated and does not protect an employee against disciplinary action based upon such absences." Rankin v. Seagate Tech., Inc., 246 F.3d 1145, 1147-48 (8th Cir. 2001); see Frazier v. Iowa Beef Processors, Inc., 200 F.3d 1190, 1195 (8th Cir. 2000); Bailey v. Amsted Indus. Inc., 172 F.3d 1041, 1045-46 (8th Cir. 1999).

**C.** Finally, even if Dalton had a chronic serious health condition so that her hospital visit on February 28 FMLA-protected, we agree with the district court that ManorCare was entitled to summary judgment because it terminated Dalton for reasons other than her work absences on February 28 and March 1. Prior to this

absence, Dalton was given a Third/Final Written Warning for performance deficiencies unrelated either to her medical condition or to attendance issues. When Dalton returned to work on March 2, ManorCare resumed the disciplinary process it commenced on February 21, concluded that Dalton had violated more performance work rules in the interim, and terminated her consistent with the disciplinary provisions in its employee handbook.[7]

Unlike nearly all our prior FMLA interference cases, this was not a termination for excessive absenteeism. In such cases, the issue often turns on whether absences the employer took into account were in fact FMLA-protected, in which case there may have been wrongful interference. See, e.g., Lovland, 674 F.3d at 812-13. Here, by contrast, Dalton's termination was the end of an on-going, unrelated disciplinary process. "[N]o employee taking FMLA leave is entitled to 'any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.'" Thorneberry v. McGehee Desha Cnty. Hosp., 403 F.3d 972, 977 (8th Cir. 2005), quoting 29 U.S.C. § 2614(a)(3)(B).

Dalton testified that she believed ManorCare terminated her because of medically-justified poor attendance, rather than unrelated performance deficiencies. But it is undisputed that ManorCare was seriously concerned about Dalton's work performance before she went to the emergency room on February 28, which undercuts her unsupported assertion. See Hervey v. Cnty. of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008); Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002). Alternatively, Dalton argues that her termination was sufficiently related to FMLA-

---

[7]ManorCare's handbook states: "If a Final Written Warning has been received for any type of violation, the next violation in two years regardless of type, *will* result in termination." Dalton presented no evidence that ManorCare did not "actually and habitually" enforce this disciplinary policy. Estrada v. Cypress Semiconductor (Minn.) Inc., 616 F.3d 866, 872 (8th Cir. 2010).

protected activity because, if she had not gone to the hospital, she would have gone to work on February 28 and avoided termination by completing her end-of-month duties. This contention is too speculative to refute ManorCare's undisputed evidence that Dalton was terminated for performance deficiencies unrelated to her need for medical care. Because ManorCare has shown that Dalton was terminated for reasons unrelated to her absence on February 28 and March 1, summary judgment was appropriate on her interference claim even if that absence was FMLA-protected.

The judgment of the district court is affirmed.

_____