# United States Court of Appeals

### For the Eighth Circuit

_____

No. 23-1087

_____

Tonya C. Huber

*Plaintiff - Appellant*

v.

Westar Foods, Inc.

*Defendant - Appellee*

------------------------------

Equal Employment Opportunity Commission

*Amicus on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: October 24, 2024
Filed: May 30, 2025

_____

Before COLLOTON, Chief Judge, LOKEN, SMITH, GRUENDER, BENTON, SHEPHERD, KELLY, ERICKSON, GRASZ, STRAS, and KOBES, Circuit Judges, En Banc.

_____

STRAS, Circuit Judge, with whom LOKEN, GRUENDER, BENTON, GRASZ, and KOBES, Circuit Judges, join.

Tonya Huber suffered a diabetic episode that kept her out of work for several days. The question is what claims, if any, she has after Westar Foods, Inc. fired her for failing to notify a supervisor. An interference claim under the Family and Medical Leave Act survives, *see* 29 U.S.C. § 2615(a)(1), but we otherwise affirm the grant of summary judgment to Westar.

I.

Westar runs Hardee's restaurants across Nebraska and Iowa. Huber managed one, which meant a full-time schedule that often involved beginning her shift at 5 a.m. and opening the restaurant an hour later.

Huber had trouble following Westar's attendance policy, specifically the requirement that late or absent employees "call the management person in charge immediately." Her first violation involved leaving a shift without notifying her district manager. A few months later, she violated it twice more by missing a shift without notice and leaving another without "call[ing] . . . and speak[ing] directly" to her supervisor. At that point, Westar informed her that any "further unscheduled or unexcused absences" risked "further disciplinary action, up to and including termination."

Huber was also experiencing health difficulties. About two months into the job, she received a diabetes diagnosis, which required her to take insulin at work and eat meals during her shifts. According to Huber, her supervisors provided no help. One said that finding a room-temperature location to store her insulin was a "[you] problem, not a [me] problem." Another, Cindy Kelchen, suggested she put it in a cooler. Later, when Huber struggled to find time to eat, Kelchen told her to get better at time management.

Diabetes also caused her to miss work. As relevant here, she woke up one morning feeling "out of it" and "in a complete fog," with a blood-sugar level "in the low 60s." She did not "know . . . who [she] was, what [she] was, [or] where help

was." She drove herself to a nearby clinic, where a doctor placed her on an IV for the rest of the day. She made several calls to her boyfriend and son, but she does not remember any of them. They recalled her being "all over the place" and "very groggy, out of it."

Meanwhile, the Hardee's opened more than five hours late because she never notified anyone that she would be absent. Westar only found out when a customer called to complain that the restaurant was closed, which set off a flurry of activity. Kelchen eventually reached Huber's son, who explained that she was at the hospital because "her levels were off." Until then, *no one* at Westar had any idea she was ill.

Huber did not call until the next day, several hours after her next 5 a.m. shift was set to start. During the call, Huber told Kelchen what had happened and informed her that she needed to take sick leave. Huber did not remember the conversation clearly because she was still groggy, but her boyfriend, who had been sleeping in an adjacent room, did. According to him, Kelchen was "screaming" at her.

Kelchen's notes say that Huber had been at the doctor because "her levels of her diabetic w[ere] off." They also mention she had been "too drugged out [to call], couldn't concentrate, and . . . would contact [Kelchen] later." When Kelchen reminded Huber about "needing to make that simple phone call," she responded that she was "out of it" and "not making sense" because of "a serious medical happening." She pointed to a doctor's note she had just sent. When Kelchen asked Huber why she could drive to the doctor on her own, yet not "call at all" despite knowing she had to open both days, she had no response. About thirty minutes after the call, Westar's president decided to fire her.

Before she found out about Westar's decision, Huber tried to request FMLA leave for the days she missed. To her surprise, not only did Westar deny it for "fail[ing] to provide notice" of her request "as soon as possible and practical," but she had lost her job for once again "fail[ing] to follow [Westar's] notice procedures."

-3-

Based on these events, Huber filed this lawsuit alleging interference and retaliation under the FMLA and disability discrimination under the Americans with Disabilities Act and the Nebraska Fair Employment Practice Act. On cross-motions for summary judgment, the district court granted Westar's, which ended Huber's case.

## II.

We review the district court's summary-judgment ruling de novo. *See Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1134 (8th Cir. 2020). "Summary judgment is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted). A genuine issue for trial exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## A.

The FMLA allows eligible employees to take unpaid leave "[b]ecause of a serious health condition." 29 U.S.C. § 2612(a)(1)(D). When employees seek leave, employers cannot "interfere with, restrain, or deny" it, *id.* § 2615(a)(1), nor retaliate against an employee who requests it, *id.* § 2615(a)(2). Huber alleged in her complaint that Westar did both when it terminated her.

## 1.

To succeed on an interference claim, Huber must show that "she was eligible for . . . leave," that Westar "knew she needed [it]," and that it "denied her a[] . . . benefit to which she was entitled." *Smith v. AS Am., Inc.*, 829 F.3d 616, 621 (8th Cir. 2016); *see Lovland v. Emps. Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir. 2012) (stating that "terminating an employee while on FMLA leave" can be interference).

-4-

Here, Westar's main argument is that it did not know about Huber's need for leave before it decided to fire her.

A jury could see things differently. *See Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 991 (8th Cir. 2005). An employee does not need to "invoke the FMLA by name." *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000). Rather, "the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Id.* In this case, Huber provided Westar with a doctor's note explaining the seriousness of her condition, including the need to be off work while she recovered. Add the fact that Kelchen's notes from her call with Huber state that "her levels of diabetic w[ere] off," and a reasonable jury could conclude that Westar knew she "need[ed] FMLA leave" for a serious health condition. *Murphy v. FedEx Nat'l LTL, Inc.*, 618 F.3d 893, 903 (8th Cir. 2010) (citation omitted).

A jury could also find that she was entitled to it, despite the late notice. Employees must provide advance notice "[w]hen the leave is foreseeable." *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1016 (8th Cir. 2013). When it is not, notice must be "as soon as practicable under the facts and circumstances of the particular case." *Id.* (quoting 29 C.F.R. § 825.303(a)). Westar questions whether a call the morning after she received emergency medical treatment was soon enough, given that she made several calls to her son and boyfriend in the meantime.

If Huber's account is to be believed, the answer is yes. "As soon as practicable" means what it says: when it is "both possible and practical" to give notice. *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 852 (8th Cir. 2002) (quoting 29 C.F.R. § 825.302(b)). Evidence points both ways. On the one hand, her calls to her son and boyfriend suggest that she could have called Kelchen sooner, perhaps while at the clinic. On the other, she reported being "in a complete fog," under heavy medication, and "out of it." *See* 29 C.F.R. § 825.302(b); *see also id.* § 825.303(c) ("[I]f an employee requires emergency medical treatment, he or she would not be required to follow the call-in procedure until his or her

-5-

condition is stabilized . . . ."). Exactly when it was "possible and practical" for Huber to notify Westar of her need for FMLA leave presents a classic jury question. *Spangler*, 278 F.3d at 852 (quoting 29 C.F.R. § 825.302(b)); *see Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008).

So does Westar's argument that it terminated Huber for the "wholly unrelated" reason that she violated the company's attendance policy. *See Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006) (noting that there is no interference when the "reason for dismissal is insufficiently related to FMLA leave"). Employees can be terminated while on leave if "the employer would have discharged" them anyway. *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 980 (8th Cir. 2005). But not when the termination is "*connected with* [their] FMLA leave." *Dalton v. ManorCare of W. Des Moines, IA, LLC*, 782 F.3d 955, 960 (8th Cir. 2015) (emphasis added) (citation omitted).

Our decision in *Clinkscale v. St. Therese of New Hope*, 701 F.3d 825 (8th Cir. 2012), shows this principle at work. The issue there was whether a nurse who was fired for "patient abandonment" could sue for interference when the "supposed abandonment . . . was precipitated by a panic attack—a symptom of her anxiety disorder and the reason she required medical leave." *Id.* at 828–29. We concluded that the answer was yes. *See id.* at 829. There, just like here, "the notice had been provided . . . late." *Id.* at 828. It did not matter. "Given the evidence suggesting a causal connection between [the nurse's] condition and her" alleged misconduct, the hospital could not "reasonably claim her termination bore no relation to her FMLA-qualifying condition." *Id.* at 829. The question went to a jury. *See id.*

Huber's evidence suggests the same causal relationship may be present here. Her alleged misconduct of failing to make a timely call to her supervisor was "precipitated by" her diabetic episode, "the reason she required medical leave." *Id.* "Given the evidence suggesting a causal connection between [Huber's] condition and her [violation of the attendance policy], the district court erred in concluding as a matter of law that" her misconduct was "not related" to a "serious health

condition." *Id.* at 829; *see Stallings*, 447 F.3d at 1050 ("[A]n employee can prove interference with an FMLA right regardless of the employer's intent."); *see also Wallace v. FedEx Corp.*, 764 F.3d 571, 590 (6th Cir. 2014) (noting that a "failure to report for work" is not a "legitimate and independent reason for dismissal" when the "absences and cause for discharge relate directly to the FMLA leave"). "[A] jury must ultimately decide whether [Westar] denied [her] a benefit" under the FMLA. *Black v. Swift Pork Co.*, 113 F.4th 1028, 1032 (8th Cir. 2024).

2.

Retaliation claims are different. At their core, they are about discrimination, situations in which an employer treats an employee differently because of a request for a statutory benefit. *See Lovland*, 674 F.3d at 811−12. Unlike interference claims, the dispute often centers on whether an employer was motivated by "retaliatory intent." *Stallings*, 447 F.3d at 1051; *see Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012) (requiring proof "that the employer was motivated by the employee's exercise of rights under the FMLA" when it took the adverse action). Here, Huber claims that Westar fired her because of her "use of leave." *Stallings*, 447 F.3d at 1051 (citation omitted). It treated her differently, in other words, because she engaged in protected conduct by seeking FMLA leave. *See Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 552 (8th Cir. 2021).

Retaliatory intent can be proven directly or indirectly. *See id.* at 551. Directly establishing it is rare, because it requires a "specific link" to "the challenged decision." *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 924 (8th Cir. 2014). To qualify, the evidence "must be strong and clearly point to an illegal motive." *Id.* Nothing in this case rises to that level. Huber identifies a few stray comments by Kelchen and a prior supervisor months before Westar fired her. Among them were unhelpful suggestions about where she could store her insulin at work and to get better at time management, but none provide a "specific link" to FMLA leave, much less the request she made months later. *See Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012) (holding that comments made six months before the

-7-

decision to fire an employee were not direct evidence of discrimination); *Browning v. President Riverboat Casino-Mo., Inc.*, 139 F.3d 631, 635 (8th Cir. 1998) ("'[D]irect evidence' does not include 'stray remarks in the workplace' . . . ." (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring in the judgment))).

Without direct evidence, her only option is to establish retaliatory intent circumstantially, through the three-part *McDonnell-Douglas* burden-shifting framework. *See Ebersole*, 758 F.3d at 924; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The first step is to establish a prima facie case, which requires evidence that: "(1) she engaged in a protected activity; (2) she suffered a materially adverse employment action; and (3) a causal connection existed between the" two. *Boston v. TrialCard, Inc.*, 75 F.4th 861, 869 (8th Cir. 2023). If she overcomes that hurdle, the next step requires Westar to come up with "a legitimate, nondiscriminatory reason" for its actions. *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 866 (8th Cir. 2015). At the final step, the focus shifts back to Huber to show that the nondiscriminatory reason was just a pretext for unlawful discrimination. *See id.*

Huber's retaliation claim likely does not make it past the first step, establishing a prima-facie case. Her causal chain is built entirely on timing: Westar's decision to fire her came just 30 minutes after she spoke to Kelchen about her diabetic episode and mentioned her need to take off work, so requesting leave *must* have led to her firing. Temporal proximity between a protected activity and a decision to fire, demote, or take other adverse action against an employee *can* support an inference of causation. *See Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006). *But cf. Boston*, 75 F.4th at 869 ("Generally, more than mere temporal proximity between protected activity and adverse action is required."). But the ultimate question at step one remains whether the evidence "gives rise to an inference of a retaliatory motive." *Hite*, 446 F.3d at 866 (citation omitted).

On these facts, we doubt it does. Even taking the facts in a light most favorable to Huber, as we must, Kelchen confirmed during the call that Huber's diabetic episode created a need for FMLA leave *and* that she had violated the attendance policy twice more, despite receiving warnings that "further unscheduled or unexcused absences . . . may lead to further disciplinary action." The "coincidental timing" in this situation does not create an inference that her firing was caused by retaliatory intent. *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir. 1997).

Besides, even if the "coincidental timing" matters more at the pretext stage, *id.*, nothing would change, *see Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) (observing that "the employee must . . . point to some evidence that the employer's [legitimate, nondiscriminatory reason] is pretextual"). Both before and after her firing, Westar consistently pointed to her violations as a legitimate, non-discriminatory concern about her performance. In these circumstances, when a violation of company policy was "a problem before the employee engaged in the protected activity," it both "undercuts the significance of the temporal proximity" and provides "an explanation" for it "other than a retaliatory motive." *Id.*; *see Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1101 (8th Cir. 2011) ("A plaintiff's prima facie retaliation case, built on temporal proximity, is undermined where the alleged retaliatory motive coincides temporally with [a] non-retaliatory motive."). Without *any* other evidence that Westar's "real reason" for firing her "was retaliation for her exercise of her [FMLA] rights," Huber has not "carried the burden" needed to survive summary judgment. *Smith*, 302 F.3d at 836.

B.

Much the same goes for Huber's disability-discrimination claims under the Americans with Disabilities Act and the Nebraska Fair Employment Practice Act. *See Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 777 n.3 (8th Cir. 2012) (making clear that the analysis under the two statutes is the same). Now the focus shifts from her request for FMLA leave to her diabetes, which the parties agree is a disability.

-9-

Also undisputed is that she "was qualified to perform the essential functions of the job." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). The disagreement is once again over causation: whether Westar's decision to fire Huber was "actually motivated" by her diabetes. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (citation omitted); *see Lowery v. Hazelwood Sch. Dist.*, 244 F.3d 654, 657–58 (8th Cir. 2001) (requiring "evidence of a causal connection between . . . [the] disability and the adverse employment action"). Using analysis that resembles our treatment of Huber's FMLA retaliation claim, we conclude that no reasonable jury could conclude it was.

Just like under the FMLA, there are two ways to establish the necessary causal link: direct evidence or the *McDonnell-Douglas* burden-shifting framework. *See Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 544 (8th Cir. 2018). This time, Huber claims to have direct evidence of discrimination in the form of "conduct or statements by [decisionmakers] that may be viewed as directly reflecting [an] alleged discriminatory attitude" toward her diabetes. *Id.* at 543 (citation omitted).

Huber relies on two facts: Kelchen's anger the morning after her diabetic episode and her supervisors' refusal to assist her in storing her insulin and taking meal breaks at work. Even if we assume Kelchen qualifies as a decisionmaker, *see Gruttemeyer v. Transit Auth.*, 31 F.4th 638, 648 (8th Cir. 2022) (noting that the focus is on "individuals with influence over decisionmaking"), neither *directly* establishes a discriminatory motivation for the firing. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1045–46 (8th Cir. 2011) (en banc).

Start with Kelchen's anger toward her during the call. It no doubt showed a lack of compassion for her situation, but an obvious explanation was the lack of a call the day before, which resulted in the restaurant opening several hours late. It directly shows Kelchen *was* angry, but not *why* she was angry. *See Massey-Diez v. Univ. of Iowa Cmty. Med. Servs.*, 826 F.3d 1149, 1161 (8th Cir. 2016) (explaining when a statement is "blatant" enough to be direct evidence); *cf. Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1324 (8th Cir. 1994) (holding that a statement that

-10-

women in sales were "'the worst thing' that had happened to the company" was direct evidence of sex discrimination). Was it the absences, the restaurant opening late, the diabetes, or the failure to call? The evidence is just too vague to be direct. *See Torgerson*, 643 F.3d at 1045–46.

The statements by her supervisors are also indirect. Recall that she requested meal breaks and a place to store her insulin, but her supervisors did not help with either request. They no doubt could—and probably should—have done more, but their refusal is not direct evidence of disability discrimination for two reasons. First, the remarks may directly show indifference, but not a discriminatory attitude. *See Lipp*, 911 F.3d at 543 (explaining that a statement must "directly reflect[] the alleged discriminatory attitude" (citation omitted)). Second, no reasonable jury could find that the statements were direct evidence of disability discrimination because she cannot explain why, if Westar really did act because of her disability, it waited so long to fire her. They were, in other words, not "sufficiently related to [her] termination." *Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 609 (8th Cir. 2006).

Indirect evidence, however, still has a role to play under the *McDonnell-Douglas* burden-shifting framework. We can assume, without deciding, that Huber has established a prima-facie case of disability discrimination. The burden then shifts to Westar to provide a legitimate, nondiscriminatory reason for its decision to fire her. *See Boston*, 75 F.4th at 867. The reason it offered was Huber's repeated violations of the company's attendance policy. *See Price v. S-B Power Tool*, 75 F.3d 362, 365–66 (8th Cir. 1996) (noting that "violat[ing] the company's attendance policy" is a "legitimate[,] nondiscriminatory reason for . . . dismissal").

Westar has consistently relied on this explanation. In fact, it became a focus even before the company decided to fire her, when Kelchen reminded Huber during the call about the "need[] to make that simple phone call" before missing work or coming in late. The termination letter, sent five days later, was even more explicit: her firing was due to the "fail[ure] to follow [Westar's] notice procedures for [her] absences" despite being "fully aware" of them after several warnings.

-11-

As is often the case, this discrimination claim comes down to pretext. To survive summary judgment, Huber's evidence must create a genuine dispute on the ultimate question, which is whether "discrimination was the real reason" for her firing. *Wilking v. County of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998) (citation omitted). Evidence that "the employer's explanation . . . has no basis in fact" or "that a [prohibited] reason more likely motivated the employer" can get her there, *Torgerson*, 643 F.3d at 1047 (alteration in the original) (citation omitted), but only if it would allow a reasonable jury to conclude that discrimination *really* motivated the employer's decision. *See* Fed. R. Civ. P. 56(a). That is, the attendance policy was just an excuse for the decision to fire her. *See Raytheon*, 540 U.S. at 53 (noting that the claim requires the employer to act "based on [the employee's] status as disabled").

To make that point, she tries to establish pretext through what amounts to a strong prima-facie case. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc). Once again, the linchpin is timing: Kelchen's anger and the decision to fire her occurred while she was still recovering from her diabetic episode. *See Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015) (noting that "[p]roximity . . . can . . . establish causation for a *prima facie* case"). Further support can be found in the alleged hostility of her supervisors, who refused to reasonably accommodate her requests for meal breaks and storage of her insulin. *See Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 833–34 (8th Cir. 2000) (noting that the plaintiff had "presented *prima facie evidence* of [his employer's] repeated denials of requests for reasonable accommodations" (emphasis added)), *abrogated on other grounds by Torgerson*, 643 F.3d at 1059. Viewed separately or together, however, neither creates a genuine issue of material fact on pretext. *See Torgerson*, 643 F.3d at 1052.

It is true that the timing looks bad for Westar. But as we have recognized before, close timing can rarely show pretext on its own. *See Corkrean v. Drake Univ.*, 55 F.4th 623, 632 (8th Cir. 2022). "[A]ttempt[ing] to prove pretext or actual discrimination," after all, "requires more substantial evidence [than it takes to make

-12-

a prima facie case] . . . because . . . [it] is viewed in light of the employer's justification." *Smith*, 302 F.3d at 834 (third alteration in original) (citation omitted). Even if the timing here is enough to establish a prima-facie case, it falls short of establishing pretext. The reason is the point we highlighted earlier: Westar's legitimate nondiscriminatory reason for firing her, the violations of the attendance policy, "coincide[d]" with her diabetic episode. *Id.* Given that the violations had posed a "problem before," it "undercuts the significance of the temporal proximity" and provides "an explanation . . . other than" discrimination. *Id.*

Kelchen's anger during the call is just another variation on the same theme. Although it is possible that it reflected animus toward Huber's diabetes, Huber has not shown why animus was the more likely explanation over the attendance-policy violations. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006). Nothing from the call, even when viewed in the light most favorable to her, rules out the nondiscriminatory reason, leading us right back to inferring discrimination based on temporal proximity. *See id.* (affirming summary judgment to the employer because the allegations of pretext did not "debunk[] the asserted rationale for . . . termination"); *see also Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001) (requiring "more substantial evidence" because claims of pretext must be "viewed in light of the employer's justification"). The "coincidental timing" is not enough here, at least at the pretext stage. *Smith*, 109 F.3d at 1266.

Nor is Kelchen's statement disclaiming knowledge about Huber's diabetes.[1] To start, it is not even clear Kelchen "falsely denied" anything. *Post*, at 18. Read

---

[1] The dissent emphasizes this point, even if Huber never has. Her opening brief barely mentions it. There is a reference to it in her reply brief, largely in response to Westar's assertion that it was "unaware of Huber's diabetes until after her termination." Raising a legal argument for the first time in a reply brief, however, is too late to preserve the point for appeal. *See Gatewood v. City of O'Fallon*, 70 F.4th 1076, 1079–80 (8th Cir. 2023) ("Appellate courts do not generally review arguments first raised in a reply brief." (citation omitted)); *see also ASARCO, LLC v. Union Pac. R.R. Co.*, 762 F.3d 744, 753 (8th Cir. 2014) ("Judges

-13-

in context, the statement during her deposition was a reference to her lack of knowledge in the months leading up to the diabetic episode, not a claim that she did not learn about Huber's condition during the conversation occurring just minutes before the termination decision. *See Merechka v. Vigilant Ins. Co.*, 26 F.4th 776, 782 (8th Cir. 2022) (explaining that the nonmoving party only gets the benefit of "*reasonable* inference[s]" at summary judgment (emphasis added) (citation omitted)). The immediately preceding questions, after all, were about conversations that allegedly happened months before, like whether they "talked . . . about not having time to eat during her shift" or where she could "store her insulin."

Regardless, Kelchen's supposed denial adds little. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (explaining that we can infer discrimination from dishonesty *if* an employee disproves her employer's innocent explanation). Knowledge and timing might matter in some discrimination cases, but not here when the *only* squabble is about exactly when Kelchen found out about Huber's diabetes. Neither the dissent nor Huber can point to *any* evidence rebutting Westar's legitimate nondiscriminatory "rationale for taking action," which was her repeated attendance-policy violations. *Bharadwaj*, 954 F.3d at 1135; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–33 (1986) (recognizing that a "failure of proof concerning an essential element of the nonmoving party's case" requires "entry of summary judgment" for the moving party). A single out-of-context statement about what Kelchen knew when—one that Huber herself barely relies upon—is not enough to create a genuine issue of material fact. *See Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022) (explaining that a party opposing summary judgment "cannot force a trial merely to cross-examine [a] witness" unless "specific facts . . . undermine [her] credibility in a material way" (citation omitted)); *see also Reeves*, 530 U.S. at 147 (noting that "dishonesty about a *material* fact" can be "affirmative evidence of guilt" (emphasis added) (citation omitted)).

---

are not like pigs, hunting for truffles buried in briefs or the record." (citation omitted)).

It makes no difference that Huber's workplace misconduct was "related to [a] disability." *Raytheon*, 540 U.S. at 54 n.6; *see Bharadwaj*, 954 F.3d at 1134 n.2, 1135 (affirming summary judgment based on a clinic's determination that a doctor had an "inability to get along with others," which may have been a symptom of a perceived "mental impairment" (quoting 42 U.S.C. § 12102(1)(A))); *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769–70 (8th Cir. 2008) (affirming summary judgment even though the employer's basis for termination, "sleeping on the job," was linked to the employee's fatigue-causing thyroid disorder). As other courts have concluded, terminating an employee for workplace misconduct, "even misconduct related to a disability," *Neal v. E. Carolina Univ.*, 53 F.4th 130, 152 (4th Cir. 2022) (citation omitted), is not discrimination "*on the basis of* disability," 42 U.S.C. § 12112(a) (emphasis added). *See Gruttemeyer*, 31 F.4th at 648 (requiring proof that the disability was a "motivating factor" for an employment decision). If the motivating reason for the dismissal was misconduct, not the underlying disability, there was no unlawful discrimination. *See Neal*, 53 F.4th at 152; *McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012); *see also* U.S. Equal Emp. Opportunity Comm'n, *Applying Performance and Conduct Standards to Employees with Disabilities*, § III(B)(9) (2008) ("The ADA does not protect employees from the consequences of violating conduct requirements even where the conduct is caused by the disability.").

Whether Huber *actually* violated Westar's attendance policy is also beside the point. All that matters is whether the company "honestly believed" she did. *Twymon*, 462 F.3d at 935; *see McNary*, 535 F.3d at 769 (noting that whether the employer's belief was correct does not "create a factual dispute as to the issue of pretext" (citation omitted)). Recall that Huber told Kelchen during the call that she had driven herself to the clinic and called her son while she was there. These statements, as well as Kelchen's response, all point toward an honest belief that Huber could have called her the day before too. Even if Kelchen was mistaken, it takes more to show that the reason for terminating her "ha[d] no basis in fact." *Torgerson*, 643 F.3d at 1047 (citation omitted); *see Pulczinski*, 691 F.3d at 1003

-15-

("To prove that the employer's explanation was false, the employee must show the employer did not truly believe that the employee violated company rules.").

Finally, Kelchen's "dismissive attitude" when asked for accommodations does not create a genuine issue of material fact on pretext either. Telling Huber she could store her insulin in a cooler was unhelpful. As was urging her to become better at time management if she wanted a meal break during the day. But both occurred months before Westar terminated her. *See Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1036 (8th Cir. 2005) (concluding that evidence that was "not close in time to the alleged adverse employment action" and that did not "relate[] to the legitimacy of [the] action" was insufficient to show pretext). More than "stray remarks . . . unrelated to the decisional process" were necessary to survive summary judgment. *Quick*, 441 F.3d at 609.

### III.

We accordingly reverse the judgment in part, remand for further proceedings on the FMLA interference claim, and otherwise affirm.[2]

ERICKSON, Circuit Judge, with whom COLLOTON, Chief Judge, and SMITH, SHEPHERD, and KELLY, Circuit Judges, join, concurring in part and dissenting in part.

I concur with the court's conclusion in Part II.A.1 but disagree with its conclusion that Huber's retaliation claim and discrimination claims cannot survive summary judgment. Huber's evidence demonstrates a question of fact exists on the issue of whether Westar's stated reason for her termination was a pretext for disability discrimination.

---

[2]Huber also appeals the denial of her motions to strike and for partial summary judgment. Though they likely became moot after the district court granted Westar's summary-judgment motion, nothing stands in the way of reconsidering them on remand.

-16-

The court suggests Huber may lack even a prima facie case of FMLA retaliation because she relies primarily on the striking overlap of her diabetic episode with the decision to terminate her employment. Unlike in typical proximity cases, where weeks or months separate protected activity from adverse action, Kelchen called Westermajer within minutes of learning that Huber's violations were caused by her diabetes. Compare Littleton v. Pilot Travel Ctrs., LLC, 568 F.3d 641, 643, 645 (8th Cir. 2009) (concluding a seven-month gap was unable to demonstrate causation), with Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002) (concluding a two-week gap was "sufficient," albeit "barely so," to complete a plaintiff's prima facie case of FMLA retaliation). Although mere temporal proximity rarely links a protected activity to adverse action strongly enough to prove retaliation, "temporal proximity alone [may] be sufficient" if the distance is "very close." Sisk v. Picture People, Inc., 669 F.3d 896, 900 (8th Cir. 2012) (cleaned up). Huber's connection is measured in minutes, not months, so it falls on the right side of the line. See Lightner v. Catalent CTS (Kansas City) LLC, 89 F.4th 648, 656 (8th Cir. 2023) (holding that plaintiff presented submissible case where adverse action was taken within 48 hours); Marez v. Saint-Gobain Containers, Inc., 688 F.3d 958, 963 (8th Cir. 2012) (similar).

In any event, because the record was fully developed on the motion for summary judgment, whether Huber properly made out a prima facie case is no longer relevant, and the court may turn directly to whether there is a genuine issue for trial on the question of discrimination. See U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714–15 (1983); Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005). The court concludes Huber cannot show discrimination with suspicious timing evidence because her violations of the call-in policy overlapped with her diabetic episode such that the two cannot be disentangled. Then it dismisses her other examples of hostility on the basis that they fail to rule out Westar's explanation. These conclusions, however, rest on disputed facts that, if resolved in Huber's favor, constitute indirect evidence sufficient to allow a reasonable jury to conclude that Westar's decision to terminate Huber was rooted in prohibited reasons and those prohibited reasons "more likely motivated" Westar's termination decision.

-17-

Torgerson v. City of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc) (cleaned up).

As to Huber's FMLA retaliation claim, the court reworks the timeline to favor Westar. It states Kelchen "confirmed" during the December 21 call "that Huber's diabetic episode created a need for FMLA leave *and* that she had violated the attendance policy twice more." The record, when viewed in a light most favorable to the nonmoving party as we must at this stage, shows something different. Kelchen learned of Huber's first violation on December 20, anticipated Huber would be absent the following day, and confirmed her suspicions when she spoke with Huber's replacement. Contrary to the court's suggestion, what Kelchen established during the December 21 call was not the fact of the violations, but the why: Huber's diabetes had left her delirious and incoherent for more than a day. A reasonable jury could conclude Kelchen's new understanding of Huber's medical needs more likely motivated her to terminate Huber than her preexisting knowledge of Huber's attendance policy violations.

The same goes for Huber's discrimination claims. Intentional discrimination "must be determined by a finder of fact making important credibility determinations." Bassett v. City of Minneapolis, 211 F.3d 1097, 1109 (8th Cir. 2000), abrogated on other grounds by Torgerson, 643 F.3d at 1059. Kelchen's notes from the December 21 call acknowledge Huber is "diabetic" and reference issues with her "levels" and "sugar level[s]." Yet Kelchen later falsely denied having "any knowledge prior to Tonya's termination that she had diabetes." This conflict puts Kelchen's credibility squarely at issue. See Holland v. Gee, 677 F.3d 1047, 1063 (11th Cir. 2012) (concluding decisionmaker's false denial that he knew plaintiff was pregnant could lead a jury to make an adverse credibility determination and find pregnancy was a motivating factor for termination). A jury could well disbelieve Kelchen and conclude Kelchen's neutral explanations for her decision are an invention intended to mask discriminatory intent. See Euerle-Wehle v. United Parcel Serv., Inc., 181 F.3d 898, 900 (8th Cir. 1999) (evaluating whether "the reason" for termination "was created to disguise an illegal discriminatory motive");

-18-

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (citing "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt" (cleaned up)).

The court reassures that "in context, the statement during [Kelchen's] deposition was a reference to her lack of knowledge in the months leading up to the diabetic episode." When we look to context, we do so "in the light most favorable to the *nonmoving* party," drawing "all reasonable inferences in *its* favor," and leaving credibility determinations for the finder of fact. Sherr v. HealthEast Care Sys., 999 F.3d 589, 597 (8th Cir. 2021) (cleaned up) (emphasis added). The court's optimistic interpretation in Kelchen's favor is not "the only reasonable inference," such that it is appropriate to take a credibility determination from the jury. Merechka v. Vigilant Ins. Co., 26 F.4th 776, 782 (8th Cir. 2022) (cleaned up); see also Hossaini v. W. Missouri Med. Ctr., 97 F.3d 1085, 1088 (8th Cir. 1996) ("[T]he court cannot weigh the evidence or grant summary judgment merely because it believes the nonmoving party will lose at trial."). Indeed, one may assume Kelchen learned of Huber's diabetes "just minutes before the termination," as the court does, and still note she denied having such knowledge "at any point" before the termination.

The court credits Westar with a consistent focus on Huber's policy violations. But this "consistency" requires a generous reading of the record in Westar's favor. This assertion also runs through Kelchen, who spoke with Amy Rowe about Huber's prior violations of the attendance policy. She did the same thing before Rowe sent Huber's termination letter, which stressed that Westar cared only about Huber's failure "to follow the Company's notice procedures" on December 20 and 21. The persuasive force of Westar's consistency argument only works if the jury finds Kelchen credible, and a reasonable jury, when the facts are viewed in a light most favorable to Huber, would have more than ample reason to conclude she is not. It is difficult to imagine a lie more material than, in a case alleging disability discrimination, a supervisor's lie about her knowledge of her subordinate's disability. See Reeves, 530 U.S. at 147; cf. Lee v. State of Minn., Dep't of Com.,

157 F.3d 1130, 1134–35 (8th Cir. 1998) (treating a supervisor's false statements as immaterial because they did not relate to a protected characteristic).

Credibility disputes aside, Westar's focus on its attendance policy looks different when viewed in a light most favorable to Huber. Westar handled her prior attendance issues with coaching sessions and warnings. Later, when Kelchen linked Huber's diabetes with a violation, Westar skipped past these steps and moved directly to termination. On a record like this one, Westar's deviation from established practice is as much circumstantial evidence of pretext as it is evidence of Westar's consistently neutral focus. See Erickson v. Farmland Indus., Inc., 271 F.3d 718, 727 (8th Cir. 2001) (noting evidence an employer varied from normal practice may suggest a "discriminatory attitude"). Put differently, the court credits Westar's consistency even though that evidence is also highly susceptible to an adverse interpretation. After all, while Westar has discretion over "business judgments" like employee discipline, it cannot use this discretion to disguise discrimination. Kincaid v. City of Omaha, 378 F.3d 799, 805 (8th Cir. 2004).

That principle is particularly important when Kelchen's few interactions with Huber reflect irritation with Huber's disability. For example, Kelchen refused to help Huber find a place to store her insulin or time for meal breaks so that she could take her insulin. A reasonable jury might conclude this indifference—repeated so soon before Huber's firing and considering Kelchen's false denial—shows Westar's focus on its attendance policy was really a practiced excuse for discrimination. See Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 834 (8th Cir. 2000) (observing "a reasonable jury could find that [the defendant] viewed with derision [the plaintiff's] requests for reasonable accommodations" and infer its "reasons for transferring and discharging [him] were also related to contempt towards his disability"), abrogated on other grounds by Torgerson, 643 F.3d at 1059; cf. Henderson v. Ford Motor Co., 403 F.3d 1026, 1035–36 (8th Cir. 2005).

Finally, the court fragments Huber's evidence and then concludes that no piece rules out Westar's explanation. At this stage, Huber need only present

evidence that "a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." Torgerson, 643 F.3d at 1047; see also Fitzgerald v. Action, Inc., 521 F.3d 867, 877 (8th Cir. 2008) (observing that "fact[s] which could cause a reasonable trier of fact to raise an eyebrow" provide "additional threads of evidence that are relevant to the jury" (cleaned up)). Huber's claim may proceed even if her proof of discrimination does not foreclose other possibilities. Huber has met that burden. On this record, a reasonable jury convinced that Kelchen is not credible could conclude Huber's termination was motivated by discriminatory attitudes.

Unresolved material factual disputes remain in this case, particularly with respect to Kelchen's credibility. These factual issues are properly left to the ultimate finder of fact to resolve. For these reasons, I respectfully dissent from the court's conclusions in Parts II.A.2 and II.B.

_____