# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-1374
_____

Brooke Henderson; Jennifer Lumley

*Plaintiffs - Appellants*

v.

Springfield R-12 School District; Board of Education, of the Springfield R-12
School District; Grenita Lathan

*Defendants - Appellees*

Martha Doenning

*Defendant*

Yvania Garcia-Pusateri; Lawrence Anderson

*Defendants - Appellees*

------------------------------

Americans for Prosperity Foundation; Alliance Defending Freedom; Foundation
for Individual Rights and Expression; Defense of Freedom Institute for Policy
Studies; Reason Foundation; American Civil Liberties Union of Missouri; State of
Missouri; State of Arkansas; State of Georgia; State of Idaho; State of Iowa; State
of Kansas; State of Kentucky; State of Montana; State of Nebraska; State of North
Dakota; State of South Carolina; State of Tennessee; State of Texas; State of Utah;
State of Virginia; State of West Virginia; Institute for Free Speech; Manhattan
Institute; Parents Defending Education; Pacific Legal Foundation; Cato Institute;
Center of the American Experiment; Goldwater Institute; Kansas Justice Institute;
Mississippi Justice Institute; Show Me Institute; America First Legal Foundation;
Hamilton Lincoln Law Institute; Mountain States Legal Foundation; Texas Public

Policy Foundation

*Amici on Behalf of Appellant(s)*

Missouri School Boards' Association

*Amicus on Behalf of Appellee(s)*
_____

No. 23-1880
_____

Brooke Henderson; Jennifer Lumley

*Plaintiffs - Appellants*

v.

Springfield R-12 School District; Board of Education, of the Springfield R-12 School District; Grenita Lathan

*Defendants - Appellees*

Martha Doenning

*Defendant*

Yvania Garcia-Pusateri; Lawrence Anderson

*Defendants - Appellees*

-------------------------------

Americans for Prosperity Foundation; Alliance Defending Freedom; Foundation for Individual Rights and Expression; Defense of Freedom Institute for Policy Studies; Reason Foundation; American Civil Liberties Union of Missouri; State of Missouri; State of Arkansas; State of Georgia; State of Idaho; State of Iowa; State of Kansas; State of Kentucky; State of Montana; State of Nebraska; State of North Dakota; State of South Carolina; State of Tennessee; State of Texas; State of Utah; State of Virginia; State of West Virginia; Institute for Free Speech; Manhattan

Institute; Parents Defending Education; Pacific Legal Foundation; Cato Institute; Center of the American Experiment; Goldwater Institute; Kansas Justice Institute; Mississippi Justice Institute; Show Me Institute; America First Legal Foundation; Mountain States Legal Foundation; Texas Public Policy Foundation

*Amici on Behalf of Appellant(s)*

Missouri School Boards' Association

*Amicus on Behalf of Appellee(s)*

_____

Appeals from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: January 15, 2025
Filed: December 30, 2025

_____

Before COLLOTON, Chief Judge, LOKEN, SMITH, GRUENDER, BENTON, SHEPHERD, KELLY, ERICKSON, GRASZ, STRAS, and KOBES, Circuit Judges, En Banc.

_____

ERICKSON, Circuit Judge, with whom GRUENDER, BENTON, STRAS, and KOBES, Circuit Judges, join, and GRASZ, Circuit Judge, joins in all but part II.C.

Two employees of the Springfield R-12 School District brought this action pursuant to 42 U.S.C. § 1983 after they were required to attend a program in 2020 entitled, "Fall District-Wide Equity Training," which they assert demanded affirmation of the school district's views of equity in violation of the First Amendment. The district court concluded that the employees lacked standing because they had not shown an injury in fact and awarded attorney's fees to the school district. On appeal, a panel of this Court affirmed the dismissal for lack of standing but reversed the award of attorney's fees. Henderson v. Springfield R-12 Sch. Dist., 116 F.4th 804 (8th Cir. 2024), reh'g en banc granted, opinion vacated,

-3-

Nos. 23-1374, 23-1880, 2024 WL 4899801 (8th Cir. Nov. 27, 2024). Sitting *en banc*, we reverse the district court's dismissal of the claims, vacate the award of attorney's fees, and remand for further proceedings.

## I. BACKGROUND

When the complaint was filed in August 2021, Plaintiff Brooke Henderson had been employed by the school district for 12 years and served as a 504 Process Coordinator. Plaintiff Jennifer Lumley, a second year employee, was working as a records secretary for the Special Services Department. The plaintiffs alleged that while attending a mandatory district-wide equity training program for staff, the school district engaged in viewpoint discrimination, caused attendees to self-censor, and/or forced attendees to accept beliefs with which they did not agree. The facts giving rise to the claims in this litigation are generally not in dispute. As outlined in the following paragraphs, ample evidence was developed in the district court record to support the plaintiffs' allegations and demonstrate standing.

The mandatory training at the center of this dispute was offered in-person and online, with both forms providing similar ideas and instructions. Except for leadership staff, the school district required all certificated and hourly staff, including the plaintiffs, to attend equity training in the Fall of 2020. Lumley attended the training in person on October 6, 2020, and Henderson attended a virtual session on October 14, 2020.

When the training was announced, the school district communicated to Henderson that she would not receive credit if she did not attend the mandatory training, which she understood to mean that she would not receive full pay if she did not attend the training. Participants attending the online session, like Henderson, were required to have their cameras turned on during the entire program, even if they were feeling uncomfortable, so the school district could ensure full participation. The trainers told staff that it was "disrespectful" if they did not have their cameras on. Yvania Garcia-Pusateri, the school district's chief equity and diversity officer,

-4-

testified that it was "board policy" for staff to "act professional" and be accounted for at the training to receive their credits.

At the beginning of each session, school district staff, including Lumley and Henderson, were provided several documents, including one entitled "Guiding Principles." The principles listed in this handout directed staff to "Stay Engaged," "Lean into your discomfort," "Speak YOUR Truth and from YOUR Lived Experiences," "Acknowledge YOUR privileges," "Seek to Understand," "Hold YOURSELF accountable," and "Be Professional." The "Guiding Principles" were repeated by the trainers early in the power point slide presentation.[1] When the slide was published, the trainers explained to Henderson that she "needed to have 'courageous conversations;' that [she] must stay engaged; that the topics of the training can be uncomfortable, but [she] must 'lean into [her] discomfort;' that [she] should share [her] personal experiences and identities; and that [she] must acknowledge [her] privileges and hold [herself] accountable." In addition to the comments made by the trainers, the power point slide contained an explicit warning that the plaintiffs took note of: "Be Professional — Or be Asked to Leave with No Credit." Also, during the introduction, the trainers told staff during the session

---

[1]The entire slide is in the record and is consistent with the plaintiffs' assertions:

-5-

Henderson attended that they "had to agree or [they] would lose credit and that [they] had to be an ally and it was part of [their] job duty to be an anti-racist educator."

Like Henderson, Lumley was required to attend the school district's equity training as well. The school district informed Lumley that she would not receive credit if she did not attend the equity training session on October 6, 2020, which she understood meant that she would not receive full pay if she did not complete the training. Employees signed an attendance sheet to receive credit, not at the beginning of the program, but at the end of the session. Those attending the in-person session along with Lumley were instructed by the trainers, as Henderson was, that they needed to "have 'courageous conversations;' that [they] must 'stay engaged' that the topics of the training can be uncomfortable, but that [they] must 'lean into [their] discomfort;' that [they] should share [their] personal experiences and identities; that [they] must acknowledge [their] privileges and hold [them]selves accountable; and that [they] must speak [their] truths." Attendees at the in-person training were shown the same power point slide as Henderson that warned staff to "Be Professional — Or be Asked to Leave with No Credit."

The record reflects that the training program contained a variety of formats, including statements from the facilitators, videos, power point slides, interactive exercises, large group discussion, small group discussion, and written exercises. An additional component of the program consisted of online training modules that certain employees were required to complete on their own time. Henderson was one such employee, Lumley was not. Henderson was required to complete seven equity-based modules, consisting of three Social Emotional Learning modules and four Cultural Consciousness modules. The modules were developed by a planning team that consisted of current and former school district employees, including, among others, Defendants Garcia-Pusateri as well as Lawrence Anderson, the school district's office of equity and diversity coordinator.

The school district could track participation and completion of the modules. To move to the next question, the pre-programmed "correct" answer had to be

selected. As an example, in the "Overview of Social Emotional Learning from an Equity Lens" module, which Henderson completed, a question asked, "How does the addition of Focus Area V impact how you serve the students and staff of SPS [the school district]?" The module offered two choices: (1) "It provides suggested guidance regarding equity and diversity issues," or (2) "It cements equity and diversity as a district priority that must be followed by all staff." To complete the module, Henderson had to select the second choice. When Henderson selected the first choice, the following message was displayed: "Incorrect! This is not suggested guidance. It is required policy and job responsibility." Henderson disagreed with both choices because, unlike the school district's concept of equity, she believes "all people should be treated the same regardless of their race." Despite her belief, Henderson was compelled to select the "correct" answer as determined by the school district so she could complete the module and receive credit.

Henderson identified other instances when she was forced to accept the school district's viewpoint and felt compelled to answer a question in a way that she disagreed with. For instance, as part of the "Elementary and Secondary Social Emotional Learning as it Relates to Racial Injustice" modules, a question stated: "When you witness racism and xenophobia in the classroom, how should you respond?" The two choices listed were: (1) "Address the situation in private after it has passed," or (2) "Address the situation the moment you realize it is happening." When Henderson selected the first choice, she received the following message: "Incorrect! It is imperative adults speak up immediately and address the situation with those involved. Being an anti-racist requires immediate action." To complete the module, Henderson had to select the second choice, which the school district deemed the "correct" answer. After selecting that option, the following message appeared: "Correct! Being an anti-racist requires immediate action." Henderson disagreed with the "correct" answer because, based on her experience working with students and in special education for over 20 years, it is her view that the response must be tailored to the situation and the student.

The "Cultural Consciousness" modules included a self-assessment checklist. Based on the responses provided by the school district employee, the module calculated a score for how "culturally competent" the employee was. Because Henderson believed the assessment might be reviewed by the school district, she felt compelled to tailor her responses to obtain a higher score, even though some of the answers she gave were inconsistent with her views. In addition, these modules contained a self-assessment reflection and a graphic organizer that asked employees to list their vulnerabilities, strengths, and needs, which Henderson believed would be available for the school district to review. In response to an email Henderson sent to Garcia-Pusateri asking whether the reflection portion of the module was part of the mandatory training, Garcia-Pusateri told Henderson that completion of the reflection questions was required.

Turning to the training session, at one point during the program, Henderson expressed her view that Kyle Rittenhouse was defending himself against rioters and that she believed he had been hired to defend a business. In response, Garcia-Pusateri told Henderson that she was wrong and confused because Rittenhouse "murdered an innocent person" who "was an ally of the Black community." Subsequently, Henderson did not publicly express her disagreement with statements made by the trainers during the program because she knew that the school district did not accept alternate viewpoints. And if she voiced her true opinions, she would be corrected or considered unprofessional. Henderson feared being written up or terminated from her job if she expressed her true beliefs during the training, explaining: "I felt like we weren't safe to give our opinion or we would be removed from the district." She went on to state that during the training her voice was not heard, and she was told to agree or be seen as disrespectful.

Lumley also submitted "specific facts" to support her claim that she self-censored during the training. Following a video that was played regarding the George Floyd incident, Lumley expressed her opinion in a small group setting that Floyd's death was not a commentary on all law enforcement and that, in her view, not all cops were bad. Another individual, Amber Hawkins, disagreed with Lumley

and appeared upset by Lumley's views. When Hawkins spoke during the larger group discussion, she shared her opinion but did not give voice to the views offered by Lumley. During a subsequent interactive exercise, Lumley did not express her views that were at odds with Hawkins or the school district's teachings out of concern about how her comments would be received by the school district.

When Lumley eventually decided to voice her views again in response to how the school district was assigning characteristics based on race, her views were not accepted. Lumley expressed her opinions that she did not believe every white person is racist and that she did not believe she is "privileged" because she was raised in poverty and worked hard to accomplish her goals. One of the trainers, Jimi Sode, a former coordinator in the school district's office of equity and diversity, told Lumley that black people cannot be racist. When she questioned his statement, Sode told Lumley that black people can be prejudiced but not racist. Lumley was then directed to reflect on herself more. As Hawkins and other school district staff members at the training raised their voices to disagree with Lumley, the trainers did not intervene. Lumley described the next breakout session as "very hostile." Lumley "shut down" out of fear and did not express her views again because after speaking up, "it became very clear that everyone's opinion was not welcome, and it became even more hostile." Lumley contends that even though the school district indicated everyone could speak about their experiences, "that was not the case."

After a virtual training session, four staff members from one of the elementary schools in the district expressed concerns to their principal about their feelings that "if they said anything in the training[,] they would have a 'target on their back' and that it would make for a hostile work environment as the topics were very political." These concerns were forwarded to Garcia-Pusateri, who responded, in part: "I know [the trainers] are providing a safe space for the staff to engage." It's "unfortunate" the staff are "taking the content personally" and not "questioning why topics like systemic racism and white supremacy negatively impact them." Garcia-Pusateri reiterated that the training is "<u>not an invitation</u> to participate in, it is a <u>requirement</u> for staff to participate in which they are also <u>compensated</u> for."

The training defined "anti-racism" as "the work of actively opposing racism by advocating for changes in political, economic, and social life." The most important message that the trainers sought to "reiterate" at the trainings is that "there is a proactive element in place to no longer remain silent or inactive." Throughout this litigation, the plaintiffs have asserted that the training was essentially an indoctrination focused on the school district's views and its interpretation of white supremacy. In particular, the school district expected staff to accept its definition of "white supremacy," which it defined as "the all-encompassing centrality and assumed superiority of people defined and perceived as white." It instructed staff that we live in a culture "which positions white people and all that is associated with them (whiteness) as ideal." The school district acknowledged in this litigation that it continuously instructed throughout the trainings that silence from white people is a form of "white supremacy." One slide published during the training characterized forms of "white supremacy" as overt and socially unacceptable and covert and socially acceptable.[2]

---

[2]The entire slide stated:



In addition, the plaintiffs have pointed to an image containing an "oppression matrix,"[3] which listed under the first column "types of oppression"—racism, sexism, transgender oppression, heterosexism, classism, ableism, religious oppression, and ageism/adultism—and in the other columns three "social groups" labeled as "privileged," "border," or "oppressed." Individuals were classified within the matrix according to their characteristics. According to the chart, individuals in the "privileged" social group consisted of white birth-assigned males who are gender conforming adults, heterosexual, able-bodied, Protestant, and rich/upper class. At the other end of the matrix, "oppressed" social groups included: the working class and poor; elderly and young; birth-assigned females; transgender, genderqueer, and intersex individuals; Jews/Muslims/Hindus/Sikhs; lesbians and gay men; and disabled people. The plaintiffs contend that staff were required to accept (or acquiesce to) the information in the matrix. If staff did not voluntarily share their reactions to the matrix or other videos or charts, they were warned that they could be called on.

The plaintiffs maintain that the school district "made clear" at the training that it would not tolerate Henderson's or Lumley's views. Both Henderson and Lumley submitted evidence recounting their experiences at the training when they expressed

---

[3]The full graphic is below:



| TYPE OF OPPRESSION | PRIVILEGED SOCIAL GROUP | BORDER SOCIAL GROUPS | OPPRESSED SOCIAL GROUPS | SOCIAL IDENTITY CATEGORY |
|---|---|---|---|---|
| RACISM | White People | Biracial People | Asian, Black, Latina/o, Native People | Race |
| SEXISM | Male assigned at birth | Intersex People | Female assigned at birth | Sex |
| TRANSGENDER OPPRESSION | Gender conforming cis- men and women | Gender ambiguous cis- men and women | Transgender, Genderqueer, Intersex People | Gender |
| HETEROSEXISM | Heterosexuals | Bisexuals | Lesbians, Gay men | Sexual Orientation |
| CLASSISM | Rich, Upper Class People | Middle Class People | Working Class, Poor People | Class |
| ABLEISM | Able-bodied People | People with Temporary Disabilities | Disabled People | Ability/Disability |
| RELIGIOUS OPPRESSION | Protestants | Roman Catholic (historically) | Jews, Muslims, Hindus, Sikhs | Religion |
| AGEISM/ADULTISM | Adults | Young Adults | Elders, Young People | Age |

a view contrary to the school district's teachings and when and why they felt forced to self-censor. Regarding one of the incidents, when asked why the trainers in Lumley's session discounted and refused to accept Lumley's viewpoint, the school district claimed there was a difference between "racism as a structure" and being "racist" and Lumley did not understand the difference. Despite expressly telling the staff to share their personal experiences during the training, the school district likened Lumley's opposition to the school district's views on oppression and racism as "having a conversation about football and you bring up baseball."

The plaintiffs have asserted that they have shown an objectively reasonable fear of negative consequences sufficient to demonstrate an injury in fact based on the trainers' responses to their opposing views and the school district's warning that if they did not complete the training, they would not receive the mandatory professional development credit. On appeal, the school district did not take issue with many of the underlying facts the plaintiffs have relied on but instead asserted that a public employer can require employees to attend equity and diversity training, and the plaintiffs' claims fail because they received credit and pay for attending the training, despite voicing objections to the principles presented. Because we find the plaintiffs have presented sufficient details and evidence to establish standing, we reverse the dismissal of their claims and remand to the district court.

## II. DISCUSSION

### A. Plaintiffs' Claims

This is a challenging case involving the intersection of First Amendment principles with the advancement of the critical mission of understanding, educating, and creating an environment where all people, regardless of race, creed, or status are welcomed. It is important to note at the outset what this case is not about. It is not about the ability of the school district to take issues regarding race and discrimination seriously or to educate students about those issues. It is not about, as claimed by the dissenters, whether telling employees to "be professional" amounts to a

constitutional injury or whether a school district can enforce "basic expectations of every conversation in our society" without fear of a federal lawsuit. It is also not about whether we believe the views expressed by either party are appropriate or distasteful. It is not about an employer's ability to confirm employees understand the material being taught. Nor does it turn every personal belief held by an employee or a student that may be at odds with her employer or teacher into a federal cause of action. It is about whether the plaintiffs have proffered sufficient evidence, when viewed in their favor, to show they suffered a concrete and particularized injury by being chilled from speaking during the training or by being compelled to speak due to a credible threat of an adverse consequence by the school district.

Over seventy-five years ago, the Supreme Court noted that one of the functions of free speech is to invite discussion and even dispute. "It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949).

While schools may speak openly about issues regarding race and discrimination, neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969). After all, "the Nation's future depends upon leaders trained through wide exposure to [a] robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." Id. at 512 (cleaned up). At this stage, the Court's task is not to assess the school district's teaching methods, analyze the details of the school district's training, or decide whether the plaintiffs have a meritorious claim because "standing is a 'threshold inquiry' that 'eschews evaluation on the merits.'" City of Clarkson Valley v. Mineta, 495 F.3d 567, 569 (8th Cir. 2007) (quoting McCarney v. Ford Motor Co., 657 F.2d 230, 233 (8th Cir. 1981)).

Standing is an issue that we review *de novo*, <u>Dakotans for Health v. Noem</u>, 52 F.4th 381, 385 (8th Cir. 2022), and the burden rests with the plaintiffs. <u>Animal Legal Def. Fund v. Reynolds</u>, 89 F.4th 1071, 1077 (8th Cir. 2024). To have standing, a plaintiff must show three elements: (1) she suffered an injury in fact, (2) that is fairly traceable to the defendant, and (3) is likely redressable by a favorable decision by the court. <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016). At this stage, we accept as true the evidence in the record detailing the "specific facts" supporting a plaintiff's claim when assessing whether a plaintiff has demonstrated standing. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992).

Article III standing presents a question of justiciability and must be decided first. <u>Miller v. Redwood Toxicology Lab'y, Inc.</u>, 688 F.3d 928, 934 (8th Cir. 2012). Unlike in the Court's recent decision in <u>Huber v. Westar Foods, Inc.</u>, 139 F.4th 615 (8th Cir. 2025) (en banc), where the issue before us was whether summary judgment was appropriate, if a plaintiff lacks standing to pursue a claim, there is no subject matter jurisdiction over the claim. <u>Id.</u> Because jurisdiction is always the "first and fundamental question," we are required to address the issue of standing. <u>Franklin for Estates of Franklin v. Peterson</u>, 878 F.3d 631, 635 (8th Cir. 2017) (citation omitted).

As to the first element, the Supreme Court has defined an injury in fact as "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" <u>Spokeo</u>, 578 U.S. at 339 (quoting <u>Lujan</u>, 504 U.S. at 560). An injury is particularized if it affects the plaintiff in a "personal and individual way," <u>id.</u>, and concrete if it has "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts"—such as physical harm, monetary harm, a harm specified by the Constitution, and intangible harms including reputational harm, disclosure of private information, and intrusion upon seclusion. <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 425 (2021).

Whether a plaintiff has shown an injury in fact "often turns on the nature and source of the claim asserted, though it is important not to conflate Article III's requirement of injury in fact with whether a plaintiff has stated a cause of action because the concepts are not coextensive." Pratt v. Helms, 73 F.4th 592, 594 (8th Cir. 2023) (citing Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009)). While this Court has sometimes described the standing inquiry as more lenient and forgiving in the context of First Amendment claims, see e.g., GLBT Youth in Iowa Schs. Task Force v. Reynolds, 114 F.4th 660, 667 (8th Cir. 2024); Dakotans for Health, 52 F.4th at 386, we do not resolve or debate the correctness of the Court's precedent because there is no need to apply a more lenient standard in this case. Because the record contains specific facts supported by evidence showing the plaintiffs were subjected to a credible threat of adverse consequences by the school district (which was more than minimal or wholly subjective) if they opposed the school district's views on racism, their showing is sufficient to confer Article III standing.

### 1. *Chilled Speech*

Notwithstanding the difficulties posed by chilled speech claims, this Court has recognized that chilled speech can give rise to a constitutional injury. Rodgers v. Bryant, 942 F.3d 451, 455 (8th Cir. 2019). Other courts have noted "the inherent difficulty of showing an injury-in-fact on a chilled speech claim, because such injuries are, by definition, inchoate: the speech has not yet occurred and might never occur[.]" See, e.g., Rio Grande Found. v. Oliver, 57 F.4th 1147, 1160 (10th Cir. 2023) (cleaned up). Self-censorship is sufficient to give rise to an injury in fact if the plaintiff shows: (1) an intention to engage in conduct arguably implicating a constitutional interest, and (2) the existence of a credible threat of an adverse consequence. Rodgers, 942 F.3d at 455 (quoting 281 Care Comm. v. Arneson, 638 F.3d 621, 627 (8th Cir. 2011)). It is the "'chilling effect' [that] can create standing." Id. (quoting 281 Care Comm., 742 F.3d at 627-28).

-15-

In First Amendment claims, one type of injury that confers Article III standing occurs when "a plaintiff is chilled from exercising her right to free expression or foregoes expression in order to avoid enforcement consequences." Mangual v. Rotger-Sabat, 317 F.3d 45, 57 (5th Cir. 2003) (quotation and citation omitted); see Kilborn v. Amiridis, 131 F.4th 550, 565 (7th Cir. 2025) (stating Article III injury exists if there is an objectively reasonable chilling effect on the plaintiff's speech and she self-censors as a result). The inquiry is whether the government official's conduct would cause a person of "ordinary firmness" to self-censor. Naucke v. City of Park Hills, 284 F.3d 923, 928 (8th Cir. 2002) (citations omitted).

Here, as noted by the dissenters, the plaintiffs, at times, expressed views and beliefs that did not align with the school district's teachings during the training program. But that is only part of what happened. The school district's response to those views and the plaintiffs' reaction is not to be ignored. The record contains evidence indicating the plaintiffs stopped voicing their opinions and self-censored when it became apparent that their opposing views were considered unacceptable by the school district and were not only being rejected by the trainers but met with hostility from the trainers, who were employed by the school district. The plaintiffs self-censored to avoid negative consequences that the school district itself repeatedly said it would impose—the employee would be asked to leave the training; the employee would not receive credit; and Henderson and Lumley understood that if this happened, their pay would be docked because completion of the training was mandatory. The specific consequences identified by the school district for not agreeing with the school district's views on being an anti-racist educator caused an objectively reasonable chilling effect on the plaintiffs' speech.

Henderson identified an additional negative consequence, which is also in the record. She feared that if she continued to express her views, she would be written up or terminated by the school district. Henderson further explained: "I felt like we weren't safe to give our opinion or we would be removed from the district."

The plaintiffs have shown the presence of a threat in this case that is more than subjective fear. The dissenters' conclusion that the plaintiffs failed to show a credible threat is belied by the evidence in the record. Unlike in Naucke, the potential consequences for school district employees to express their views at the training went beyond merely being subjected to harassing or unprofessional comments from government officials. See 284 F.3d at 928 (determining "offensive, unprofessional and inappropriate" harassing comments from government officials were not, as a matter of law, sufficient to objectively deter someone from speaking). The adverse consequences identified by the school district, which included being removed from the training program and not getting paid, for speaking out against the school district's views gave the plaintiffs an objectively reasonable basis for self-censoring.

On these facts, it is of little consequence that ultimately no one was forced to leave the training, and the school district did not reduce anyone's pay because a plaintiff is not required to first suffer a consequence before she may bring a claim. See Speech First, Inc. v. Schlissel, 939 F.3d 756, 764 (6th Cir. 2019) ("Even if an official lacks actual power to punish, the threat of punishment from a public official who *appears* to have punitive authority can be enough to produce an objective chill."); Kilborn, 131 F.4th at 565 (refraining from using relevant cases in class out of fear that they may be too racially charged and violate the school's nondiscrimination policy is enough for the professor to establish an injury in fact). This makes logical sense as the harm is in the suppression of the speech itself, and one is not subjected to punishment for self-censorship.

This case also does not involve the type of speculative fear of punishment that this Court found insufficient to constitute an injury in fact in Zanders v. Swanson, 573 F.3d 591, 594 (8th Cir. 2009). The plaintiffs in Zanders claimed their right to make truthful, or not knowingly false, claims of police misconduct were chilled by a statute making it a crime to knowingly file a false report of police misconduct. Id. While recognizing that general factual allegations of injury could be sufficient to establish standing, because the statute did not punish the type of speech the plaintiffs

-17-

claimed was chilled, and the possibility that law enforcement might manipulate the statute was too speculative, the Court found the plaintiffs lacked standing. Id. Here, the plaintiffs wanted to speak out against the views expressed during the training program, but the evidence shows they self-censored based on the school district's warning and environment that were openly hostile to opposing views.

Judge Shepherd acknowledges in his dissent that "[t]he animating principle behind the First Amendment is to 'preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.'" Lumley and Henderson proffered evidence demonstrating the trainers created an environment where views opposing the school district's teachings were not welcome. Contrary to the dissenters' characterization, the facts establish more than mere disagreement with a viewpoint or the requirement that attendees act professionally. It's about suppression of viewpoints. A court's role at this stage is not to weigh the evidence, approve or disapprove of the contents of the program, or determine the merits of the plaintiffs' claims. The narrow issue before the Court is whether the evidence, when viewed in the plaintiffs' favor, is sufficient to show the plaintiffs self-censored due to an objectively reasonable credible threat of an adverse consequence, which is more than minimal or wholly subjective. The plaintiffs have satisfied this standard. That the school district ultimately did not act on its threat by deciding not to ask anyone to leave the training early or reduce anyone's pay does not obviate the existence of a credible threat. Likewise, the subsequent discontinuation of the training program by the school district does not nullify the plaintiffs' alleged injuries.

Because there is sufficient evidence in the record demonstrating an objectively reasonable chilling effect on speech that would cause a person of ordinary firmness to self-censor, and the plaintiffs did self-censor, the evidence in the record is sufficient to give rise to an injury in fact. The district court erred when it determined otherwise.

*2.*     *Compelled Speech*

The plaintiffs have also alleged that they were injured when they were deprived of their First Amendment right to be free from compelled speech. The doctrine of compelled speech is concerned about "the government putting particular messages in the mouths of private speakers." Cressman v. Thompson, 798 F.3d 938, 951 (10th Cir. 2015) (quotation marks and citation omitted). The Supreme Court has explained that "the First Amendment does not leave it open to public authorities to compel a person to utter a message with which he does not agree." Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 557 (2005) (quoting West Virginia Bd. of Educ. v. Barnette, 319 U.S. 624, 634 (1943)).

To state a claim for compelled speech, a plaintiff is required to establish three elements: (1) speech; (2) to which she objects; that is (3) compelled by some governmental action. Cressman, 798 F.3d at 951. The last element—compulsion— requires some punishment or consequence or threat of punishment or consequence to deter the exercise of First Amendment rights, which is more than "minimal" and "wholly subjective." Semple v. Griswold, 934 F.3d 1134, 1143 (10th Cir. 2019) (citation omitted). Put another way, mere disagreement with a speaker's views that causes discomfort, angst, or hurt feelings is not enough.

Compelled speech in violation of the First Amendment is an injury in fact. Cressman v. Thompson, 719 F.3d 1139, 1145 (10th Cir. 2013); Jacobs v. Clark Cnty. Sch. Dist., 526 F.3d 419, 426-27 (9th Cir. 2008); see Wooley v. Maynard, 430 U.S. 705, 715 (1977) (compelling speech "invades the sphere of intellect and spirit which it is the purpose of the First Amendment" to protect (cleaned up)).

Some facts supporting a compelled speech injury are like those supporting the chilled speech injury. The plaintiffs have asserted throughout this litigation that they held views and beliefs in opposition to the content of the training. The school district warned them that if they acted "unprofessional"—and the context at the training made it apparent to the plaintiffs that this included expressing views that failed to

-19-

conform with the school district's views on equity and diversity—then they would be asked to leave the training, lose the professional development credit, and their pay would be reduced. The evidence in the record, and as detailed in the preceding paragraphs, contains specific facts by way of declarations, deposition testimony, emails, training materials, etc. that show how the school district forced the plaintiffs to accept the school district's views under threat of punishment. A fear of punishment cannot be "wholly subjective" or "not credible" when the school district tells staff that they must complete the training to get paid and publishes a warning that they will be told to leave the training with no credit if they act "unprofessional." The implications of this were made evident when Henderson or Lumley expressed opposing viewpoints and the trainers made plain that the views contrary to the school district's views were wrong, confused, and unacceptable. Given all these facts, a person in Lumley's and Henderson's position had an objective basis to conclude that continued disagreement with the school district's views could lead the school district to determine they were acting unprofessional with all its attendant consequences.

Henderson has proffered additional evidence supporting her compelled speech claim that is based on the modules she was required to complete. The school district has admitted in this litigation that to move to the next question in the modules, the employee had to select the "correct" answer, which was determined by the school district and pre-programmed by the school district. Henderson submitted detailed facts during the summary judgment proceedings explaining why she disagreed with the school district's "correct" answer as to some of the questions. Nonetheless, it is undisputed that it was impossible for Henderson to complete the module without accepting the school district's view. Henderson contends that this format created by the school district compelled her to agree with the school district's views in violation of the First Amendment.

The evidence in the record, which we must accept as true and view in the plaintiffs' favor, is sufficient to show an injury in fact. See Semple, 934 F.3d at 1143 (explaining that a plaintiff can show government compulsion without identifying a direct threat rising to the level of imprisonment or a fine, but a

discouragement that is minimal and wholly subjective does not impermissibly deter the exercise of a plaintiff's First Amendment rights).  The structure of the modules did more than test an employee's understanding of the material.  The creation of a format that precluded employees from proceeding to the next question (and completing the module) unless they selected the "correct" answer as deemed by the school district forced acceptance or adoption of the school district's views.

As an alternate basis for its grant of summary judgment, the district court assumed the plaintiffs sufficiently alleged a compelled speech injury and then held that the school district may require this speech as part of the plaintiffs' official duties.  When the speech is the product of the employee's official duties, the employee is not speaking as a citizen for First Amendment purposes.  Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  The speech at issue must be "ordinarily within the scope of an employee's duties" and not merely concern the employee's official duties.  Lane v. Franks, 573 U.S. 228, 240 (2014).

The plaintiffs dispute that the speech required by this training session was pursuant to their official duties.  The district court's opinion did not consider whether there were genuine issues of material fact as to whether the speech was pursuant to official duties as opposed to merely concerning their duties.  Cf. Garcetti, 547 U.S. at 421 (noting the plaintiff conceded that he wrote the memorandum pursuant to his official duties).  There remains an unresolved dispute on the issue of whether the compelled speech, which was part of the training program, was pursuant to the plaintiffs' official duties.  "If a district court has not addressed an issue, we ordinarily remand to give that court an opportunity to rule in the first instance."  Huizenga v. Indep. Sch. Dist. No. 11, 149 F.4th 990, 999 (8th Cir. 2025).  The district court, not this Court, should consider this unresolved disputed issue in the first instance. MPAY Inc. v. Erie Custom Comput. Apps., Inc., 970 F.3d 1010, 1021 (8th Cir. 2020) ("We are a court of appellate review, not of first view." (cleaned up)). Without resolving the disputed issues, the district court's grant of summary judgment on the

compelled speech claim on this basis was inappropriate.[4]  See Yang v. Robert Half Int'l, Inc., 79 F.4th 949, 966 (8th Cir. 2023) (determining a factual dispute rendered summary judgment on the claim improper).

B.      Attorney's Fees

After dismissing the action for lack of standing, the district court found that the plaintiffs' claims were frivolous.  The court stated the plaintiffs' "total lack of injury . . . may suggest a groundlessness that trivializes the important work of the federal judiciary."  The court ultimately awarded the school district attorney's fees in the amount of $312,869.50.

The Court's decision to hear this case *en banc* undermines the rationale of the district court.  Some may consider Article III standing as applied in First Amendment claims, particularly those involving chilled and compelled speech, as complex and evolving.  Others might find the issues present in the case well-established and consistent with Supreme Court precedent dating back over 60 years.  See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963) (describing how even "informal censorship" can actionably chill speech).  As the foregoing discussion demonstrates, the standing issues presented in this case are by no means frivolous or groundless, so we reverse and vacate the district court's award of attorney's fees.

C.      Request for Reassignment

The plaintiffs have requested reassignment to a different district judge based on allegations that the judge is hostile to their claims and awarded attorney's fees in an amount more than the school district requested.  This Court has explained that

---

[4]Judge Shepherd's dissent also discusses Garcetti in the context of the plaintiffs' chilled speech claim.  The same unresolved factual dispute is present in both contexts and our reasoning for finding the grant of summary judgment inappropriate applies with equal force to the plaintiffs' chilled speech claim.

reassignment is only warranted to avoid a miscarriage of justice. Burton v. Nilkanth Pizza Inc., 20 F.4th 428, 434 (8th Cir. 2021). "Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion, and judicial remarks that are critical or disapproving of, or even hostile to a party, ordinarily do not support a bias or partiality challenge." Id. (cleaned up). Here, the district court's rulings and comments are not of such a nature to establish actual bias, nor would they cause a reasonable person to question the judge's impartiality. We deny the plaintiffs' request for reassignment to a different district judge.

## III.  CONCLUSION

For the foregoing reasons, we reverse the district court's dismissal of the plaintiffs' claims for lack of standing and remand this case for further proceedings. We also reverse and vacate the district court's award of attorney's fees. We decline the plaintiffs' request to order the case be reassigned to a different district judge.

COLLOTON, Chief Judge, with whom LOKEN, SMITH, SHEPHERD, and KELLY, Circuit Judges, join, dissenting.

The issue in this case is not whether the school district's "equity training" program was inappropriate, misguided, or offensive. That is a policy question for the local school board or other elected body. We were informed at oral argument that the local governance process has worked as it should: employees complained about the training; school board elections resulted in new board membership; and the training program has been discontinued.

The question on this appeal is whether the employees can also make a federal case out of it. To establish a case or controversy in federal court, a plaintiff must establish an injury in fact. A public employee is not injured in a constitutional sense by enduring a two-hour training program with which the employee disagrees. Plaintiffs Henderson and Lumley suffered no tangible harm as a result of the training. They received full pay and professional development credit for attending.

They continued in their employment without incident. Lumley earned a promotion soon thereafter.

In an effort to establish a case or controversy, the plaintiffs advanced various theories of injury. Like the majority here, the employees featured select images from controversial training materials that may inflame the passions of the reader but do not advance the legal inquiry. The district court found the legal arguments frivolous. On appeal, the three-judge panel was more forgiving on sanctions but explained why each theory of injury was wanting. *Henderson v. Springfield R-12 Sch. Dist.*, 116 F.4th 804 (8th Cir. 2024). The majority here understandably does not endorse some of the far-reaching arguments that were advanced by the plaintiffs and rejected by the district court and the panel. The reader is thus referred to the panel opinion for a discussion of those contentions.

The majority seeks refuge in a strained theory that Henderson and Lumley as trainees were allegedly "chilled" from speaking during a portion of the two-hour training program because they were directed at the outset to "Be Professional – Or be Asked to Leave with No Credit." Both employees spoke up freely in the training and expressed disagreement with the trainers. But the employees claim that after initially engaging in discussion, they declined to speak further because their dissenting views were not accepted by the trainers.

The court's theory of "chill" founders in part because the record does not support that the district's directive to "be professional" ever deterred Lumley from speaking. Lumley instead asserts that she refrained from further discussion at the training because she was concerned about how her comments would be received and did not want to experience more rebuttal from fellow trainees and trainers who disagreed with her. But her choice about optimizing peer relations does not show that the school district intimidated her. And a speculative wonder about how the school district would receive her comments is not an allegation of credibly threatened sanctions. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011). An employee who has not been subjectively chilled by a public official does

-24-

not suffer an injury in fact. *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam); *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992).

The theory also fails because assuming that Henderson (or Lumley), after initially engaging in discussion with the trainers, was subjectively "chilled" from further conversation in the session, the decision to self-censor based on supposed threat of sanctions was not objectively reasonable. *See Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009); *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002). An employer may direct its employees to "be professional" without causing constitutional injury. A reasonable employee would not construe a requirement of professionalism to forbid a civil discussion or debate about training materials with which the employee disagrees. Henderson and Lumley engaged in such a discussion without any retribution from the employer, either during or after the training. There is no evidence that the trainers, in response to Henderson's remarks, threatened that she would be written up or terminated for continuing to express disagreement.

The majority also opines that the school district "compelled" speech from Henderson and Lumley, but this theory fails for similar reasons. Lumley does not identify any speech that was allegedly compelled. Henderson claims that her speech was compelled in certain instances because she was required to "be professional." But any fear that she would be punished as unprofessional for stating her views is speculative and insufficient. *See Semple v. Griswold*, 934 F.3d 1134, 1143 (10th Cir. 2019).

The majority finally discerns injury on a separate claim based on the requirement that Henderson complete online training modules. To receive credit for completing the modules, Henderson eventually had to select the "correct" answers to multiple-choice questions if her first selections were deemed "incorrect." Henderson contends that she was compelled to speak when she selected answers that she thought the school district would prefer, rather than answers that she preferred.

In this type of training module, as the district court explained, an employee's "selection of credited responses on an online multiple-choice question reflects at most a belief about how to identify the question's credited response." The majority cites no authority holding that simply requiring a public employee to demonstrate verbally an understanding of the employer's training materials inflicts an injury under the First Amendment. *See Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1203 (8th Cir. 2001) ("[A] public employer may decide to train its employees, it may establish the parameters of that training, and it may require employees to participate."); *cf. Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 908 (2018) ("Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message."). Acceptance of this novel theory will make it impractical for public employers to test employees on their knowledge of organization policy without facing lawsuits for supposedly compelling employee speech.

A public employer is entitled to maintain policies with which some employees disagree. An employer does not injure an employee by failing to "welcome" opposition to its policies when, as here, the employee does not face a credible threat of adverse consequences for expressing disagreement. A public school, for example, may train its teachers to lead the Pledge of Allegiance before class. The school is not required to welcome the views of a teacher who complains that the Pledge amounts to unconstitutional religious indoctrination. The school may, without causing injury, reiterate its policy that the Pledge is constitutional, patriotic, and proper. Or a public employer may train its employees that subordinates may not be used for personal business. The employer is not required to acknowledge merit in the views of an employee who thinks it proper to use staff for private errands, and the employer may restate its policy that public employees must be assigned exclusively to public business. An employer does not cause Article III injury by declining to acquiesce in the contrary views of dissenting employees.

The majority's conclusion portends a host of litigation over public employee training. If the next "equity training" program proceeds from a color-blind

perspective in the tradition of Justice Harlan's famous dissent, and requires trainees to be professional, then the silent employee who favors modern-day diversity, equity, and inclusion will have standing to sue the school district for violations of the First Amendment. Or if a public employer trains its employees about patriotism and the sacred and cherished symbol of the American flag, and requires trainees to be professional, then the silent employee who favors flag burning as a means of protest will have standing to sue the employer for violations of the First Amendment. If it is apparent that the employer considers racial preferences or flag desecration to be unacceptable, then the court authorizes litigation by dissenting employees who claim to have "self-censored" during a training session.

Public employee training will now be fraught with uncertainty. An employer who trains on any subject from any point of view, while requiring employees to be professional, is subject to a federal lawsuit by an employee who disagrees with the training and keeps quiet. Only time will tell how the court elects to manage this new font of litigation. If the court's opinion turns out merely to reflect disapproval of one tendentious training program that judges dislike, then the decision might be good for this day and this ship only. But if the court is true to its word, then the floodgates are open.

For these reasons, I would reinstate the panel decision to resolve the appeal.

SHEPHERD, Circuit Judge, with whom LOKEN and KELLY, Circuit Judges, join, dissenting.

I fully concur in Chief Judge Colloton's dissenting opinion. I write separately to underscore the failure of the plaintiffs' complaint to allege an injury sufficient to establish standing. The question before the Court is whether the plaintiffs can point to a genuine dispute of material fact as to whether they suffered an Article III injury-in-fact. Self-censorship and compelled speech qualify as such only when a person is chilled from speaking or compelled to speak by "a credible threat of an adverse consequence." See ante, at 15 (citing Rodgers v. Bryant, 942 F.3d 451, 455 (8th Cir.

-27-

2019)); <u>ante</u>, at 19 (citing <u>Semple v. Griswold</u>, 934 F.3d 1134, 1143 (10th Cir. 2019) (requiring a consequence or threat that is more than "minimal" or "wholly subjective")). The presence of such a threat is critical, as any self-censorship or submission to compulsion "must be objectively reasonable." <u>See</u> <u>Zanders v. Swanson</u>, 573 F.3d 591, 594 (8th Cir. 2009); <u>Semple</u>, 934 F.3d at 1143 (noting that "wholly subjective" fears are insufficient). The plaintiffs do not meet this standard.

As in business and government organizations the nation over, the plaintiffs, employees of the school district, participated in mandatory training. The majority states that during the training the plaintiffs were "forced . . . to accept the school district's views under threat of punishment." <u>Ante</u>, at 20. The record contains no such evidence. While the district did caution that failure to *complete* the training would result in loss of credit, that statement does not contain even a hint that dissenting views might be punished. The closest the majority gets is a line from Henderson's deposition where she said she was told "[she] had to agree or [she] would lose credit." That line does not provide the support the majority claims for multiple, independent reasons. First, only Henderson stated as much, so the statement could have no impact on Lumley's decision to speak or not. Second, the plaintiffs *never* identified this purported threat in moving for summary judgment, resisting summary judgment, or on appeal. It is not the Court's role to identify facts in support of an argument. Even apart from the local rules requiring litigants to identify material facts, <u>see</u> W.D. Mo. L. R. 56.1, principles of party presentation mandate that courts take the arguments and facts as they are presented, <u>see</u> <u>United States v. Sineneng-Smith</u>, 590 U.S. 371, 375 (2020). The parties are the ones "responsible for advancing the facts and arguments entitling them to relief," not the Court. <u>Castro v. United States</u>, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment).

Henderson claims that she was told she "had to agree" during the training's introduction. But all parties agree what that introduction actually included: general directions to "give [the] trainers your full attention" and statements that the school district endorsed the views expressed in the training. There is nothing in the

introductory script supporting Henderson's claim, nor is it even clear what Henderson purportedly "had to agree" with. We are not required to accept as true a claim so "blatantly contradicted by the record . . . that no reasonable jury could believe it," particularly where the non-moving party did not even advance such a claim. See Scott v. Harris, 550 U.S. 372, 380 (2007). Context is key, and we cannot pull a lone, unsupported statement from the context in which it was made.

What the record does show is that the plaintiffs were told to "[s]tay [e]ngaged," "[l]ean into [their] discomfort," "[a]cknowledge [their] privileges," give the trainers their "complete attention and respect," and "[b]e [p]rofessional." These directions are neither explicit warnings nor implicit threats. Most are basic expectations of every conversation in our society. And there is no evidence—zero—that the school district *ever* used these rules to dock pay from or exclude participants who voiced dissenting views. True, the plaintiffs need not have actually suffered consequences to bring a claim. See ante, at 14-15. But the fact that nobody was ever dismissed from the training, docked pay, or stripped of development credit severely undermines the argument that they faced any "credible threat" of adverse consequences. See Zanders, 573 F.3d at 594; Republican Party of Minn., Third Cong. Dist. v. Klobuchar, 381 F.3d 785, 793 (8th Cir. 2004) (concluding that plaintiff was not "subject to 'a credible threat of prosecution'" under a statute that did not proscribe plaintiff's intended conduct (citation omitted)); cf. Telescope Media Grp. v. Lucero, 936 F.3d 740, 750 (8th Cir. 2019) (concluding plaintiffs challenging a statute that arguably compelled their speech were subject to a credible threat of enforcement where state officials had "already pursued a successful enforcement action" against similar entities).

After being directed to stay engaged and be professional, both Lumley and Henderson "participated in the discussion[s by] sharing [their] beliefs." While both plaintiffs eventually stopped voicing their opinions, neither Henderson nor Lumley did so because of any perceived threat *from the school district*. See Naucke v. City of Park Hills, 284 F.3d 923, 927-28 (8th Cir. 2002) (noting that a First Amendment retaliation claim requires adverse action *from a government official*); Kilborn v.

-29-

<u>Amiridis</u>, 131 F.4th 550, 565 (7th Cir. 2025) (reiterating that any "chilling effect" must be "caused *by the* [*government*] *officials' conduct*" (emphasis added)); <u>Cressman v. Thompson</u>, 798 F.3d 938, 950 (10th Cir. 2015) (describing compelled speech as "*the government* putting particular messages in the mouths of private speakers" (emphasis added) (citation omitted)).  Henderson admits that she declined to share her views further not because of anything the school district did, but because she "feared that debating these issues would polarize [her] *co-workers* and compromise [their] work relationship."  Although Henderson claimed she "feared being written up or terminated," that purported fear was not tied to anything besides her *subjective and personal* belief that the school district did not share her views, entirely separate and apart from anything the school district indicated.  Likewise, Lumley only refrained from continuing to share her views "because [she] did not want to experience any more backlash" from her coworkers.  The majority recounts at length how the plaintiffs felt but fails to tie those feelings to an objective threat of adverse consequences from the school district.

The plaintiffs were told that they were "wrong" and "confused" and that they needed to "reflect" on their views.  These are not threats.  "Mere disagreement" is not enough, as the majority says, even where that disagreement "causes discomfort, angst, or hurt feelings."  <u>Ante</u>, at 19.  Litigants must demonstrate an objectively reasonable fear of negative consequences.  The plaintiffs' choices to withhold their views in this case were not based on any objective evidence of reprisal by the school district, and their fears are properly characterized as "wholly subjective."  <u>See</u> <u>Semple</u>, 934 F.3d at 1143 (citation omitted).  No matter how negative, personal, or powerful those subjective feelings are, they do not constitute injury-in-fact.

The majority claims the plaintiffs were injured because the school district created an "environment that was openly hostile to [the plaintiffs'] views."  <u>Ante</u>, at 18.  But this theory and its application boil down to treating disagreement as injury-in-fact. Although purporting to disclaim that outcome, the majority offers no principled reason why the plaintiffs faced anything other than disagreement. Focusing on the trainers' conduct, describing the plaintiffs' views as "wrong" or

"confused" is, by definition, mere disagreement.  See Disagree, Merriam-Webster's Collegiate Dictionary (11th ed. 2020) ("to differ in opinion").  At most, this is an endorsement of a particular viewpoint, something well within the school district's prerogative.  See, e.g., Walls v. Sanders, 144 F.4th 995, 1004 (8th Cir. 2025) (noting that "the government is permitted to engage in viewpoint discrimination when it speaks").  Setting that disagreement to the side—as the majority apparently does—we are left with the (perhaps vitriolic) criticism from the plaintiffs' fellow attendees.  That is not enough to show "a credible threat" of an adverse consequence from the school district.  See Rodgers, 942 F.3d at 455.  Further, if a contentious environment and disagreement with one's peers is enough, even those attendees who *agreed* with the training would have standing, as they too were subjected to views with which they disagreed vehemently—those of the plaintiffs themselves.  That the majority's reasoning permits this anomalous result is further proof that the theory should be rejected.

More fundamentally, though, the majority's theory of standing is ultimately self-defeating.  For the plaintiffs' claims to succeed on the merits, the plaintiffs must have been compelled to speak or chilled from speaking in their personal capacities, i.e., not in the course of their official duties.  See, e.g., Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  Assuming the plaintiffs were acting as private citizens during this training, the other attendees were as well.  Any disagreement or opposition from the other attendees, then, does not flow from the school district.  On the other hand, if their fellow attendees *were* somehow speaking "within the scope of [their] duties," see Lane v. Franks, 573 U.S. 228, 240 (2014), so too were the plaintiffs, and their claim necessarily fails on the merits.  The majority's reasoning assumes the other attendees were speaking as part of their job duties while simultaneously assuming the plaintiffs were merely present as private citizens.  Both assumptions cannot be true.  Either the attendees were all speaking as part of their employment with the school district and the plaintiffs' claims fail on the merits, or all attendees were speaking as private citizens and the plaintiffs lack standing.  Because the plaintiffs continue to assert that they attended this training as private citizens, they must lack standing.

-31-

The animating principle behind the First Amendment is to "preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390 (1969). The government is free to place its views into that marketplace for consideration, see Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009), as "[i]t is the very business of government to favor and disfavor points of view," Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment). As even the majority recognizes, this "high purpose" is often served by creating "condition[s] of unrest, . . . dissatisfaction with conditions as they are, or even stir[ring] people to anger." Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949). Nothing in the First Amendment prohibits the government from participating in that contentious discourse; it only prohibits "government regulation of private speech." See Pleasant Grove City, 555 U.S. at 467. But under the majority's reasoning, the exercise of First Amendment rights is *ipso facto* injury-in-fact; exposure to any differing views suffices to confer standing. So long as someone disagrees with the government's opinions and is subject to some form of disagreement from another individual, the federal courts are obliged to weigh in. In my view, such reasoning does not find support in the First Amendment. See Terminiello, 337 U.S. at 4 ("[A] function of free speech under our system of government is to invite dispute."). Instead, the First Amendment creates an open market for new ideas, it does not provide a set of earplugs keeping opposing views from reaching people's ears.

The majority also suggests that Henderson has adequately shown an injury based on the modules she completed after the training. This holding is untenable. Does every public employee now suffer First Amendment injury if they are required to complete a training module by selecting answers with which they personally disagree? Surely not. See Altman v. Minn. Dep't of Corr., 251 F.3d 1199, 1203 (8th Cir. 2001). But the majority does nothing to dispel this concern, and, as Chief Judge Colloton demonstrates, such reasoning applies to all sorts of benign scenarios.

Those sharing the plaintiffs' disapproval of the content of the school district's employee training should take no satisfaction in today's decision. Here, the

plaintiffs disagreed with the content of the school district's training. However, with the new school board, next time the training curriculum may change, and the plaintiffs' views may actually be endorsed in the subject matter taught. With the majority's' reasoning as authority, the school district may again be hauled into court by employees who merely disagree. Article III standing is, and remains, a mandatory requirement that all plaintiffs must satisfy. The plaintiffs here did not do so, and I would reinstate the panel opinion on that basis. Because the majority forges a different and erroneous path, I respectfully dissent.

_____